## FINN *v.* BROWN.

ERROR TO THE CIRCUIT COURT OF THE UNITED STATES FOR THE DISTRICT OF COLORADO.

No. 106. Argued November 24, 25, 1891. — Decided December 14, 1891.

Fifty shares of the stock of a national bank were transferred to F. on the books of the bank October 29. A certificate therefor was made out but not delivered to him. He knew nothing of the transfer and did not authorize it to be made. On October 30 he was appointed a director and vice-president. On November 21 he was authorized to act as cashier. He acted as vice-president and cashier from that day. On December 12 he bought and paid for 20 other shares. On January 2 following, while the bank was insolvent, a dividend on its stock was fraudulently made, and $1750 therefor placed to the credit of F. on its books. He, learning on that day of the transfer of the 50 shares, ordered D., the president of the bank, who had directed the transfer of the 50 shares, to retransfer it, and gave to D. his check to the order of D., individually, for $1250 of the $1750. The bank failed January 22. In a suit by the receiver of the bank against F. to recover the amount of an assessment

of 100 per cent by the Comptroller of the Currency in enforcement of the individual liability of the shareholders, and to recover the $1750: *Held,*

(1) In view of provisions of §§ 5146, 5147 and 5210 of the Revised Statutes, it must be presumed conclusively that F. knew, from November 21, that the books showed he held 50 shares;

(2) F. did not get rid of his liability for the $1250, by giving to D. his check for that sum in favor of D. individually.

THE court stated the case as follows:

This is an action at law, brought in the Circuit Court of the United States for the District of Colorado, by the receiver of the First National Bank of Leadville, Colorado, against Nicholas Finn, to recover $8750, with interest upon $7000 thereof from September 28, 1885, and upon $1750 thereof from January 2, 1884. The bank was a national banking corporation; and, it becoming insolvent, the Comptroller of the Currency, on the 24th of January, 1884, appointed one Ellsworth receiver of the bank, who afterwards resigned, and the plaintiff became his successor.

The amended complaint alleges, that the defendant, on the 29th of October, 1883, became the holder of 50 shares of the capital stock of the bank, and, on the 12th of December, 1883, the holder of 20 others of such shares, the shares being of the par value of $100 each; that certificates of stock were duly issued to the defendant for such shares respectively; that, on the 28th of September, 1885, the Comptroller of the Currency, under § 5151 of the Revised Statutes, determined that, in order to provide the money necessary to pay the debts of the bank, it was necessary to enforce the individual liability of its shareholders to the full extent of 100 per centum of the par value of the shares of its capital stock, and thereupon, on that day, made an assessment to that effect, and directed the plaintiff to take the necessary proceedings to enforce such individual liability; that thereupon there became due from the defendant $7000; that due notice was thereupon served upon him; but that he had paid no part of the assessment.

The amended complaint then sets forth, as a second cause of action, that on the 2d of January, 1884, and for a long time

prior thereto, the defendant was a shareholder and director, and acting cashier, of the bank; that, on that date and for a long time prior thereto, the bank was insolvent; that on that date, by its board of directors, it fraudulently and wrongfully declared a dividend of 25 per cent on its capital stock, to be paid to its shareholders; that the defendant, as such director, was present at the meeting of the board at which such dividend was declared, and united in such action, with full knowledge of such insolvency; that on that date, the defendant received from the bank $1750, as his proportion, on said 70 shares, of said dividend, and retained, and still retains, that sum, with full knowledge that at that date there were then no net profits of the bank, and that the dividend was wrongfully withdrawn from its capital stock; and that repayment of the $1750 had been demanded by the defendant, and refused.

The answer denies that the defendant ever became the holder of the 50 shares of stock, or that there was issued to him a certificate for 50 shares, but admits that on the 12th of December, 1883, he became the holder of 20 shares, and that there was issued to him a certificate therefor. It admits the defendant's liability for $2000 on the 20 shares of stock, and alleges that, after the commencement of the suit, he paid to the plaintiff the $2000. It denies that, at the time stated in the second cause of action set forth in the amended complaint, as to the $1750, the defendant was a director of the bank, or that he ever was its acting cashier. It takes issue as to the declaring of the 25 per cent dividend, and denies that the defendant, as a director of the bank or otherwise, was present at the meeting of the board at which it was declared, or that he united in such alleged action with any knowledge of the insolvency of the bank or otherwise, and denies that he received the $1750 as his proportion of such dividend, but admits that he received $500 as a dividend of 25 per cent upon the 20 shares.

The cause was tried before the court and a jury, and a verdict was rendered for the plaintiff, for $7833.33, and a judgment for the plaintiff for that amount was entered. The defendant has sued out a writ of error to review that judgment. There is a

bill of exceptions, which contains all the evidence given on the trial.

The facts of the case appear to be as follows: The doors of the bank were closed on the 22d of January, 1884. Immediately thereafter Ellsworth was appointed receiver, and continued to be such until February 1, 1884, when, on his resignation, the plaintiff was appointed in his place. According to the stubs of the book of certificates and as shown by the stock register, 50 shares of the stock were transferred to the defendant, by issuing a certificate for 50 shares, dated October 29, 1883, 40 shares of which were issued to the defendant from the stock of one McNany, and ten shares from the stock of Frank W. De Walt, the president of the bank. Those 50 shares constituted the only stock which stood in the name of the defendant, until December 12, 1883. On the 30th of October, 1883, at a directors' meeting, the defendant was appointed a director; and on the same day, at a directors' meeting, he was appointed vice-president of the bank. On the 21st of November, 1883, at a directors' meeting, at which the defendant was present and voting, the resignation of P. J. Sours, the cashier, was accepted and the defendant, as vice-president, was authorized to act as cashier until a new cashier should be regularly appointed. On the same day, the defendant and De Walt, the president, were authorized to pass judgment on all notes, etc., offered for discount. The defendant discharged the duties of vice-president from the 21st of November, 1883, until the bank failed. It appeared from the book of share certificates, that the defendant, at the time of the failure of the bank, was the owner of 70 shares of its stock. It also appeared that, since this suit was brought, he had paid the $2000 assessment on the 20 shares. It further appeared that the defendant, as vice-president, wrote a number of letters to correspondents of the bank, notifying them of the resignation of Sours as cashier and enclosing the defendant's signature, which was to be recognized on bills of exchange, etc., subsequent to that time; and that he signed, as vice-president, between November 21 and December 12, 1883, and also between December 12, 1883, and January 22, 1884, a large number of

certificates of deposit and bills of exchange issued by the bank. No regular stock book was kept in the bank, but a list of stockholders and transfers of stock appeared in one of its books, in which was entered a credit to the defendant of 50 shares of stock on October 29, 1883, and of 20 shares more, purchased by him from Sours, on December 12, 1883. It appeared that no demand had been made upon De Walt or McNany to pay the assessment on the 50 shares. The defendant claimed that the 50 shares were transferred to him without his knowledge or consent; that no transfer appeared upon the books, to the credit of either De Walt or McNany from the defendant, of any sum of money for the 50 shares; and that the certificate for the 50 shares was not among the papers of the bank, so far as the receiver could ascertain. The defendant, on cross-examination as a witness, gave evidence tending to show that, in connection with De Walt, he had fulfilled the duties of cashier of the bank from the time of his election as vice-president. The books of the bank showed that it was insolvent on January 2, 1884. Sours owned 20 shares of the stock on the 29th of October, 1883. On that day he tendered his resignation to the president, and on the same day the president instructed him to issue a certificate of stock for 50 shares in the name of the defendant, transferring 40 shares thereof from the stock of McNany, and ten shares from the stock of De Walt. Sours wrote the certificate, signed it as cashier, and left it in the book of certificates, but did not deliver it to the defendant. On the 21st of November, 1883, Sours attended a meeting of the directors, at which time his resignation as cashier was accepted; and, at that meeting, the defendant was elected a director, and on the same day, at a meeting attended by the defendant, the latter was elected vice-president. On December 12, 1883, the defendant paid Sours $2400 for his 20 shares, and Sours handed to him the certificate therefor, duly assigned. It was customary for Sours, as cashier, to sign new certificates of stock as issued. He resigned because he was not satisfied with the manner in which the bank was conducted and had his fears of coming disasters. He knew that no cashier had been elected to take his place, and that the

duties of that office had been performed by the defendant; and Sours ceased his active connection with the bank after the defendant had been elected vice-president and before he disposed of his stock to the defendant.

The defendant testified that he knew nothing of the transfer of the 50 shares of stock to his name, and was absent from Leadville at the time; that after he returned, he was urged by De Walt to invest in the stock of the bank and become one of its active officers, which he consented to do; that on the 21st of November, 1883, he was elected a director, he being present at the meeting; that, at the same meeting, he was elected vice-president, and entered at once upon the discharge of his duties; that he was then urged to obtain some stock in the bank, and was informed by the president that 20 shares of the stock could be secured from Sours for a premium of $20 per share, and was advised by the president to take it, the latter representing the bank to be in a prosperous condition; that the defendant then purchased the 20 shares from Sours, and had them transferred to his name on the books, and took a certificate therefor; that, from the time of his election as vice-president, he performed some of the business of the bank, had his headquarters in the bank, wrote some letters, and signed some certificates of deposit and bills of exchange, the business being of a routine character, and he having little knowledge of the books and no knowledge of the condition of the bank, and relying almost entirely upon the representations and management of the president; and that he never had a certificate for the 50 shares or any other shares, except the 20 shares.

On the 2d of January, 1884, a dividend of 25 per cent on the capital stock of the bank was declared, and the sum of $1750 was transferred to the credit of the defendant, as his share of such dividend on 70 shares of stock. At that time, the bank was wholly insolvent, and the declaration of the dividend was fraudulent. According to the record of the directors' meeting at which the dividend was declared, the defendant was present and seconded the motion to declare the dividend. The entry in the book of records of the bank of

the declaration of the dividend was thought to be in the handwriting of a female relative of the president. The defendant testified that on the 2d of January, 1884, he was informed by De Walt, the president, that a dividend of 25 per cent had been declared, and, by some one else, that the sum of $1750 on account of such dividend had been transferred to his credit by order of De Walt : that, being the owner of only 20 shares, he at once inquired of De Walt about it, when, for the first time, he was informed that the 50 shares had been transferred to his credit and stood in his name on the books of the bank, in consequence of which $1250 had been transferred to his credit as soon as the dividend was declared ; that he inquired of De Walt why the 50 shares were in his name, and was informed that they had been so transferred merely because De Walt thought the defendant might desire to purchase them as a good investment ; that the defendant at once repudiated the transaction, and refused to purchase the stock or have anything to do with it, and ordered De Walt to retransfer the same back to his own name without delay ; that the defendant immediately sat down and drew his check for $1250 to the order of De Walt individually, and handed it to the latter ; that the check was duly charged on the books of the bank to the defendant and credited to the account of De Walt ; that almost immediately thereafter, the defendant was summoned on a jury, and was kept in attendance thereon almost constantly until the 21st of January, 1884, the day but one before the suspension of the bank ; that, during a part of such jury service, he was confined with the other jurors, and not permitted to separate from them ; that the next day after the agreement of the jury, he was engaged in looking after the affairs of the bank, and did not think of the stock or whether it had been transferred by De Walt ; and that the bank almost immediately suspended.

The defendant also gave evidence tending to show that he never attended a meeting of the directors for the purpose of declaring the dividend of January 2, and knew nothing about the fact that the books contained such an entry ; and that he had no knowledge of the declaration of the dividend beyond

the statement of De Walt to that effect. He recognized the handwriting of the entry of the meeting at which the dividend was declared as being that of a lady cousin of De Walt; and testified that, according to the best of his information, the entry was written at the house of De Walt and not at the bank; that he never examined the book of certificates of shares, or any other entry or any other book, with reference to the shares; that he had no knowledge of the insolvent condition of the bank, and was assured by De Walt that the bank was doing a large business and making money, and that the shares were a profitable investment; that to the best of his recollection he had not sworn that the bank was in good condition on January 1, but, as one of the directors, he attested a sworn statement of its condition, which was verified by the president; that at the time the dividend was declared, he was of the belief that the president had the right to set apart from the profits of the bank such an amount as would represent the dividend which might be declared; that he paid no further attention to it after that; and that he was not aware that the bank was then insolvent and not in a condition to pay its debts, nor aware, at the time of the suspension of the bank, that there was less than $100 in currency on hand.

At the close of the evidence, the court refused to submit the cause to the jury, to which refusal the defendant excepted. The court then instructed the jury that, under the evidence of the defendant himself, as well as under the testimony for him, he was estopped from denying his ownership of the 50 shares; and that, inasmuch as he had not repaid the $1250 of dividend to the bank, but had paid it to De Walt, he had not refunded that amount in the manner in which he should have done. The court thereupon instructed the jury to find a verdict for $5000, the par value of 50 shares at $100 per share, and interest on such par value at the rate of ten per cent per annum from the date of the demand for payment by the plaintiff, together with $1750 dividend on the 70 shares of stock. The defendant excepted to that instruction. The defendant then asked the court to give seven several instructions, which were refused, and to each refusal the defendant excepted.

The defendant then moved for a new trial, which was denied by the court, in an opinion reported in 34 Fed. Rep. 124. The ground of the denial of the motion for a new trial was stated by the court in its opinion to be, that the defendant was chargeable with notice of the transfer of the 50 shares to him, he having acted as vice-president and cashier during the time when those shares were transferred to him; that any investigation of the books of the bank would have led to the discovery that he was a stockholder to the extent of the 50 shares in question; that, when he was informed of the dividend of January 2, all he did was to pay the $1250 to De Walt, who, he supposed, was the owner of the shares; and that he did not return the money to the bank.

*Mr. T. M. Patterson* for plaintiff in error. *Mr. C. S. Thomas* and *Mr. C. C. Parsons* were on the brief.

The first assignment of error is based upon the refusal of the court to permit the said cause to go to the jury, and instructing them to find a verdict against the plaintiff in error, and that the plaintiff in error was estopped from denying the ownership of the 50 shares of stock standing in his name upon the books of the bank. Shares of stock in a corporation subject their owners to individual liability. The ownership of it is not, therefore, necessarily beneficial, but may impose liabilities which are greater than the advantages arising from its possession, and hence, in the transfer of corporate stock, which necessarily carries with it all the responsibilities attaching to the ownership, there is no presumption of acceptance. It is especially clear that, where an attempt is actually made to enforce the liability of the transferee, no presumption will prevent his right to refuse the transfer. *Cartmell's Case*, L. R. 2 Ch. 691; *Robinson* v. *Lane*, 19 Georgia, 337; *Skowhegan Bank* v. *Cutler*, 49 Maine, 315. In all cases, however, in which the transfer of the stock has originally been made without the knowledge and consent of the transferee, he has the right to repudiate the transaction, providing he has not already confirmed it. *Ex parte Hennessey*, 2 Macn. & Gord. 201; *Webster* v. *Upton*, 91 U. S. 65; *Turnbull* v. *Payson*, 95 U. S. 418; *Keyser* v. *Hitz*, 133 U. S. 138.

The transfer of stock to a person upon the books of a company is not sufficient in itself to make him an owner of the same and subject to the liabilities thereof, unless he shall have done something which shall constitute an acceptance of the transfer, or which estops him to deny his ownership. *Tripp* v. *Appleman,* 35 Fed. Rep. 19 ; *Turnbull* v. *Payson, supra.* What will amount to an acceptance in the transfer of stock is a question of fact not as yet regulated by any general rules of law. *Pim's Case,* 3 DeG. & Sm. 11 ; *Sanger* v. *Upton,* 91 U. S. 56.

In the transfer of personal property — and corporate stock is personal property and subject to all the general rules of law regulating it — it may be safely said : There is no acceptance unless the transferee has exercised his option to receive or reject the property transferred, or has done something which will operate to deprive him of his option. *Gillman* v. *Hill,* 36 N. H. 311, 320 ; *Shepherd* v. *Pressey,* 32 N. H. 55 ; *Messer* v. *Woodman,* 22 N. H. 172, 181 ; *S. C.* 53 Am. Dec. 241 ; *Belt* v. *Marriott,* 9 Gill, 331 ; *Clark* v. *Tucker,* 2 Sandford, (N. Y.) 157.

In the light of these authorities, it is very clear that the plaintiff in error should have been allowed to go to the jury with the defence which he had made. That defence involved questions of fact, of the truth of which it was the sole judge. *Commissioners of Marion County* v. *Clark,* 94 U. S. 278, 284 ; *Pawling* v. *United States,* 4 Cranch, 219, 222 ; *Chicago, Rock Island &c. Railway* v. *Lewis,* 109 Illinois, 120, 124 ; *Lord* v. *Pueblo Smelting & Refining Co.,* 12 Colorado, 390.

The second assignment is based upon the error of the Circuit Court in instructing the jury that under the evidence of the defendant, as well as the testimony of the defence, the defendant was estopped from denying the ownership of the stock in controversy, (which has been discussed,) and that, inasmuch as he had repaid the $1250 in dividends, not to the bank, but to Frank W. De Walt, he did not refund the amount thereof in the manner which he should have done — in other words, that he should have paid the $1250 to the bank instead of to Frank W. De Walt. This was fallacious.

Immediately upon the declaration of a dividend by the

directors of a company, it becomes a debt due and payable from the company to the stockholders. *King* v. *Paterson & Hudson River Railroad*, 5 Dutcher (29 N. J. Law) 82, 504; *March* v. *Eastern Railroad*, 43 N. H. 515; *Foote, Appellant*, 22 Pick. 299; *Fawcett* v. *Laurie*, 1 Drew. & Sm. 192. The $1250 in question was a 25 per cent dividend upon the 50 shares of stock here involved. This dividend, as soon as it was declared, became the property of the owner of that stock at the time of declaring the dividend. The court below instructed the jury that this should have been paid to the bank, and that when Finn failed to repay it to the bank he did not return it in the proper manner. Certainly the bank was not the owner of this stock, nor could it be the owner of its own stock under the National Banking Law, save as security for a preëxisting debt. If it was not the owner of the stock, it had no more right to the dividend than any stranger.

It was urged at the trial in the court below, and accepted by the presiding judge as the law, that the 50 shares of stock having been transferred upon the stock books as above described, and standing in the name of the defendant in error upon the stubs at the time of his election, he would be estopped from denying their ownership and would be conclusively presumed to be the owner of the same because he had accepted the office of director.

In Morse on Banks and Banking, p. 117, it is said, referring to the statutory prerequisite for qualification as director: "This regulation, however, simply prescribes the requisite qualification for his election to the office. If a person not thus qualified is elected, and seeks to enter upon the office without qualifying by the purchase of the requisite number of shares, he may be ousted by legal process, but his acting as a director will not make him in any manner liable for this number of shares. Neither can he be regarded either at law or in equity, or for any purpose, as the constructive owner of them. His entering upon the enjoyment of the office does not in any case estop him from alleging his non-ownership of the requisite number of shares to qualify him for the position." By how much the stronger is the rule to be applied when the director

shall have qualified himself, in fact, by the purchase of 20 shares in addition to those upon which this constructive liability is sought to be enforced.

The same rule has been laid down with the same certainty· in England in *Ex parte Marquis of Abercorn*, 4 DeG., F. & J. 95 ; *Roney's Case*, 4 DeG. J. & S. 426.·

There can be no question from the foregoing authorities, that the mere acceptance of the office of director will not ʿonstitute one so accepting a shareholder in the company, in the absence of an express agreement between him and the company that he will in fact become so ; and it is no less true that the·only obligation·imposed upon the one so accepting is that he shall, within a reasonable time, in case he accepts and enters upon the duties of his office,. qualify himself as a director by the purchase of the requisite number of shares..

*Mr. J. B. Henderson* for defendant in error.　*Mr. Edward O. Wolcott, Mr. Joel F. Vaile* and *Mr. Henry F. May* filed a brief for same.

Mr. Justice Blatchford,. after stating the case, delivered the opinion of the court.

The contention on the part of the defendant is that the Circuit Court erred in not allowing the cause to go to the jury. It is undoubtedly true, as contended by the defendant, that, as the 50 shares of stock were transferred to him originally without his knowledge and consent, he had a right to repudiate the transaction ; but he is presumed to be the owner of the stock when his name appears upon the books of the bank as such owner, and the burden of proof is upon·him to show that he is in fact not the owner. *Webster* v. *Upton*, 91 U. S. 65, 72 ; *Turnbull* v. *Payson*, 95 U. S. 418, 421 ; *Keyser* v. *Hitz*, 133 U. S. 138. We think it entirely clear, on the evidence, that the defendant did not sustain such burden of proof; and that there was no question thereon for the jury.

It is provided as follows, in regard to national banks, by § 5146 of the Revised Statutes : " Every director must, during

his whole term of service, be a citizen of the United States, and at least three-fourths of the directors must have resided in the State, Territory or district in which the association is located, for at least one year immediately preceding their election, and must be residents therein during their continuance in office. Every director must own, in his own right, at least ten shares of the capital stock of the association of which he is a director. Any director who ceases to be the owner of ten shares of the stock, or who becomes in any other manner disqualified, shall thereby vacate his place." Section 5147 reads as follows: "Each director, when appointed or elected, shall take an oath that he will, so far as the duty devolves on him, diligently and honestly administer the affairs of such association, and will not knowingly violate, or willingly permit to be violated, any of the provisions of this title, and that he is the owner in good faith, and in his own right, of the number of shares of stock required by this title, subscribed by him, or standing in his name on the books of the association, and that the same is not hypothecated, or in any way pledged, as security for any loan or debt. Such oath, subscribed by the director making it, and certified by the officer before whom it is taken, shall be immediately transmitted to the Comptroller of the Currency, and shall be filed and preserved in his office."

The meaning of § 5146 is that every director must own in his own right, during his whole term of service, at least 10 shares of the stock; and that, if he does not own such 10 shares, he cannot become or continue a director. In the absence of any proof on the subject, it is to be presumed that' the defendant took the oath prescribed in § 5147, when he was appointed, that he owned 10 shares of the stock. As he was appointed a director and vice-president at least as early as November 21, 1883, and acted as such from that time, and did not purchase the 20 shares from Sours until December 12, 1883, he was violating the law during that interval, unless he owned during that space of time at least 10 shares of the stock; and if he took the oath prescribed by § 5147, he took it untruly if he did not own when he took it 10 shares of the stock. According to his own testimony, he was elected vice-

president on the 21st of November, and acted as such from that time, and also from that time fulfilled the duties of cashier of the bank, covering the period prior to December 12, when he purchased the 20 shares from Sours. The only state of facts consistent with the truth, according to the books of the bank, is that he owned the 50 shares from October 29, 1883, the day those shares were transferred to him, and the day before the records of the bank show that he was elected a director. It would appear that those 50 shares may have been transferred to him at par; and he paid a premium of $20 a share for the 20 shares which he purchased from Sours.

It is provided as follows by § 5210 of the Revised Statutes : " The president and cashier of every national banking association shall cause to be kept at all times a full and correct list of the names and residences of all the shareholders in the association, and the number of shares held by each, in the office where its business is transacted. Such list shall be subject to the inspection of all the shareholders and creditors of the association, and the officers authorized to assess taxes under state authority, during business hours of each day in which business may be legally transacted. A copy of such list, on the first Monday of July of each year, verified by the oath of such president or cashier, shall be transmitted to the Comptroller of the Currency."

It was the duty of the defendant, as acting cashier, and in the absence of any regular cashier, and of any other person authorized to act as cashier, to cause to be kept, under § 5210, the list of shareholders and of the number of their shares, therein specified ; and the conclusive presumption must be that he kept such list and was cognizant of its contents. It necessarily showed his ownership of the 50 shares. Irrespective of the general duties imposed by law upon the cashier of a bank, or a person who acts as such cashier, the statute imposed upon him, in the present case, the specific duty mentioned in § 5210 ; and it must be presumed conclusively that he knew, from the 21st of November, 1883, that the books showed that he was a shareholder to the amount of the 50 shares. The instruction of the Circuit Court to that effect was, therefore, proper.

In regard to the dividend of 25 per cent it was clearly fraudulent and unlawful. The defendant did not get rid of his liability for the $1250 by drawing his check for that sum in favor of De Walt individually and handing the same to De Walt. The money belonged to the bank, and ought to have been restored to the bank. The dividend being unlawful, and the $1250 having been paid to the defendant by the bank, by being transferred to his credit by the bank on its books, it was not for him to take the place of the bank and to pay the money to De Walt. Whatever might have been the case if the dividend had been a lawful one and if the $1250 had been transferred by the bank to the credit of the defendant through inadvertence, the $1250 was no more the lawful property of De Walt than if the 50 shares (10 of which had been the property of De Walt) had not been transferred to the defendant by the instruction of De Walt to Sours to that effect.

The various instructions asked by the defendant and refused, were all of them predicated, in substance, on the assumption that the conduct of the defendant and his connection with the bank were not such as to estop him from denying his ownership of the 50 shares of stock, and upon the alleged fact that the defendant, by paying the $1250 to De Walt in respect of the 25 per cent dividend on the 50 shares, had freed himself from his liability to repay such dividend to the bank.

No general rule can be laid down as to what will constitute, in any particular case, an acceptance of the transfer of stock or the equivalent thereof, in a case where the transferee is in fact ignorant of the fact of transfer; but each case must be decided on its own facts. In the present case, the defendant testifies that on the 2d of January, 1884, when he was informed of the 25 per cent dividend and of the transfer to his credit of $1250 thereof, he at once repudiated the transaction and ordered De Walt to transfer the 50 shares to his own name without delay. But this was of no more effect than his drawing his check for the $1250 to the order of De Walt individually, and handing it to De Walt. The defendant, as vice-president and acting cashier of the bank, had the power himself to transfer

the 40 shares back to McNany and the 10 shares back to De Walt. He did not do so, but, knowing that the 50 shares had been transferred to his credit and stood in his name upon the books, he suffered the matter to remain in that shape for twenty days, until the doors of the bank were closed. He states that he did not go upon the jury until after the transaction which resulted in the drawing of the check to the order of De Walt for $1250. It was the defendant's duty, and he had the power, himself to make the transfer upon the books of the bank, *Whitney* v. *Butler*, 118 U. S. 655, 662; *Richmond* v. *Irons*, 121 U. S. 27, 58; and it made no difference as to his power to transfer, that the certificate for the 50 shares had not been delivered to him. *Pacific National Bank* v. *Eaton*, 141 U. S. 227, 233. It appears by the evidence that the bank had a stock register and a book of certificates of shares, and that a list of stockholders and of transfers was kept in one of its books, although it had no regular stock book.

The jury would not have been justified in holding the defendant not liable for the assessment on the 50 shares or for the $1750 dividend. The dividend was undoubtedly fraudulent, and the records of the bank were falsified in showing that the defendant was present at the meeting at which the dividend was declared. It was declared, probably, by De Walt himself alone, for the purpose of showing a fictitious prosperity and of concealing from the public and the directors the real condition of the affairs of the bank. The defendant had had no previous connection with banking business, and was deceived by De Walt. But all this cannot relieve him from liability. The statutes of the United States are explicit as to the necessary ownership of stock in a national bank by a director thereof, and as to his taking an oath to that effect, and as to the keeping by the cashier of a correct list of the shareholders and of the number of shares each of them holds; and it cannot be held, with any safety to the interests of the public and of those who deal with national banks, that a director, who also is vice-president and acts as cashier, can shield himself from liability by alleging ignorance of what appears by the books of which he has charge.

It has been held in England, that the fact that a person acts as director will not of itself make him liable as a holder of the number of shares required to qualify him to be a director, *Marquis of Abercorn's Case*, 4 De G., F. & J. 78, 95, 110; *Roney's Case*, 4 De G., J. & S. 426; but we decide this case on the fact that the defendant appeared by the books of the bank to be the holder of the 50 shares prior to the time when he became a director or vice-president, and prior to the time when he began to act as cashier; and we hold that, acting in those capacities down to the time when the doors of the bank were closed, he must be presumed conclusively to have had knowledge, during that interval, of what the books of the bank showed in regard to his holding the 50 shares; and that his action in respect of the 25 per cent dividend, after he learned of it on the 2d of January, 1884, was such as not to relieve him from his liability for the $1250.

In some of the English cases cited, there was no requirement that, in order to be a director, there should be ownership of a specified number of shares. In the present case, the statute required an ownership of at least 10 shares, to become or to continue a director; and as the books of the bank showed that 50 shares were transferred to the defendant before he was elected a director, and that those shares were in one certificate, the defendant could not have been advised that he held 10 shares, without learning at the same time that he held 50 shares. But, in view of the requirements before referred to, of the statute of the United States, no rule of law deduced from the English authorities can apply.

*Judgment affirmed.*