## GREANEY v. DEITRICK.
### No. 3415.

Circuit Court of Appeals, First Circuit.
March 25, 1939.

David Stoneman, of Boston, Mass. (Daniel J. Gallagher and Emmanuel Kurland, both of Boston, Mass., on the brief), for appellant.

Brenton K. Fisk, of Boston, Mass. (Andrew J. Aldridge, of Boston, Mass., on the brief), for appellee.

Before BINGHAM and WILSON, Circuit Judges, and BREWSTER, District Judge.

WILSON, Circuit Judge.

This is an appeal from a decree in equity by the District Court of Massachusetts in favor of the Receiver of the Boston-Continental National Bank, a national banking association located in Boston in the Commonwealth of Massachusetts, holding the defendant-appellant liable on a note signed by him, amounting to $14,553.-66, and a part of the assets of the closed Boston-Continental National Bank, and also holding the defendant-appellant liable on an assessment by the United States Comptroller of Currency against him for $9,144 as the owner of 457.2 shares of stock of said closed bank.

The facts are as follows: Early in 1930 the Boston National Bank, in violation of the National Banking Act, 12 U.S.C.A. § 83 purchased 190 shares of its own capital stock. In order to conceal this unlawful act and to deceive the National Bank Examiner, the president of the bank and Greaney, one of its directors, induced one Karnow, a small depositor in the bank, to execute and deliver to the bank for its accommodation, as the District Court found, his note for $23,500.

Karnow's note was discounted by the bank and the proceeds were deposited in another Boston bank to the credit of Greaney. Greaney then drew his check against this fund in favor of the Boston National Bank and the 190 shares of its capital stock were transferred on its books to him.

Karnow, when his note became due, was prevailed upon, against his better judgment, to renew it, and shortly thereafter the stock standing in Greaney's name was transferred on the books of the bank to the name of Karnow and he took possession of it. The District Court found that at no time did Karnow intend to become the owner of the bank stock, but he eventually had the stock transferred to his name as security while his note was held by the bank.

In September, 1930, a consolidation of the Boston National Bank and the Continental National of Boston was effected, under the name of the Boston-Continental National Bank. The 190 shares of the National Bank then standing in Karnow's name were converted into 684 shares of the capital stock of the consolidated bank of the par value of $20 per share.

Two men by the name of Ragan, president of the Continental National Bank, and Balter, an officer of that bank, were instrumental in bringing about the consolidation of the Boston National and the Continental National Bank, and to carry out their plan it was necessary to acquire considerable stock of the Boston National Bank.

Three notes of Ragan and Balter amounting to $24,000 were delivered to Greaney with instructions to apply the proceeds to the Karnow note and to obtain from Karnow the 190 shares of the Boston National Bank stock.

It is unnecessary to outline in detail the various steps in the financial life of the Boston-Continental National Bank under the guidance of Ragan and his co-directors, so far as it relates to the 190 shares of stock and the notes given in connection therewith by Ragan and Balter, prior to the closing of its doors by the Comptroller of Currency in December, 1931. It is sufficient to say that the first note of Ragan and Balter for $9,500 came due in March, 1931, which was paid, and pursuant to an understanding with Karnow 226.8 shares of stock of the Boston-Continental National Bank was released by Karnow and he was credited on the books of the bank with a payment of $9,500 on his note of $23,500.

In May, 1931, due to the repeated insistence of Karnow, the Boston-Continental National Bank agreed to surrender Karnow's note given to the Boston National Bank, and it was arranged to substitute Greaney's note to the Boston-Continental National Bank for $14,553.66, representing the unpaid balance of the Karnow note. At the same time the remainder of the stock standing in Karnow's name was surrendered to Greaney and was registered on the bank's books in the name of one Mahoney, a son-in-law of Greaney, but without Mahoney's knowledge or consent.

Upon the closing of the doors of the Boston-Continental National Bank, a receiver was appointed, and on July 11, 1932, an assessment was made by the United

States Comptroller of Currency against all stockholders of the bank equal to the par value of their stock. The assessment on the shares of stock standing in the name of Mahoney has never been paid and this equity suit was originally brought against the three defendants, Greaney, Mahoney and Karnow, to determine the ownership of the shares and the liability of the owner or owners.

The District Court found as facts that Karnow, when he gave his note to the Boston National Bank upon the urging of Greaney and its president, and took the stock of the bank in his own name, had no intention of becoming the purchaser of the stock, and that it was also understood that his note was given solely "to accommodate the bank," and to conceal the unlawful purchase of the stock by the bank. The court also found that when Greaney's note was given in May, 1931, it was substituted for that of Karnow's, and Karnow was released thereon, and the stock of the bank standing in the name of Karnow was transferred to Greaney. While it was agreed at that time that Greaney "should take the stock on the same terms that Karnow held it" the District Court held that Greaney thereby became the owner of the stock, although he had it registered in the name of Mahoney. It cannot be denied that the entire transactions to cover up the unlawful proceedings by the Boston National Bank, or by its officials in relation to this stock, were unlawful.

The pertinent points on which the appellant relies are stated in accordance with Rule 36 of this court (1939):

"1. The court having found as a fact that the Karnow note was given as an accommodation to the bank, for its benefit, and that the Greaney note was a substitute for the Karnow note, the Greaney note was without consideration and purely an accommodation for the bank, and is not enforceable against him, notwithstanding that he was, at the time, a director of the bank.

"2. The court having found as a fact that the Karnow note was part of a scheme by the bank to conceal its illegal act, and the Greaney note was a substitute therefor, the Greaney note is unenforceable, because of illegality.

"3. The court having found that the Karnow note was an accommodation to the bank and part of a scheme by the bank to conceal its illegal act, the Greaney note having been given in substitution for the Karnow note, the Greancy note is unenforceable, because of illegality."

"8. This is not an action against a director for violation of his duty as a director either under the statutes or under the common law.

"9. The receiver-plaintiff here has no greater rights, on the facts properly found, to recover on this note than the bank could have had; since the bank could not have enforced any claim based on the Greaney note."

"11. The Circuit Court of Appeals on its own motion has power to order the transfer to the law side of the court under Equity Rule 22, so that the defendant may exercise his constitutional right to a trial by jury."

The appellant contends that the District Court erred in ruling that the defendant Greaney was liable on his note of $14,553.66, and also on the assessment against him upon the stock standing in the name of Mahoney in the additional amount of $9,144, as claimed by the appellee, and in support of his contention submits the following propositions of law:

I. Whether the receiver of a closed national bank may recover from the maker of an accommodation note given to the bank, at its request, and taken by the bank for the purpose of concealing its ownership of shares of its own stock previously acquired by it in violation of law.

II. Whether the receiver of a closed national bank may recover a stock assessment from one who holds stock registered in the name of another as security against his promissory note given to the bank for its accommodation and to enable it to conceal its illegal ownership of said stock.

The possible injury to the bank and any potential detriment to its creditors was occasioned by the purchase of the stock by the Boston National Bank. Under these circumstances, it is submitted, the law is clear that the maker of a note may set up as a defense that such a note was given for the accommodation of the bank, and instead of the maker being precluded from asserting the defense by reason of his participation in such an illegal enterprise, a receiver of a closed bank is not permitted to enforce payment because of the bank's participation in the unlawful acts. Rankin, Receiver, v. City National Bank, 208 U.S. 541, 546, 28 S.Ct. 346, 52 L.Ed. 610.

All the cases bearing upon the liability of the maker of such a note given to a national bank for its accommodation, to enable it to conceal from a national bank examiner and the Comptroller of Currency its true financial condition, we think establish the following propositions:

"(1) the maker of such a note may set up lack of consideration as a defense;

"(2) participation by the maker and the bank acting through its officials in such an illegal transaction does not aid the bank's receiver in a suit to recover on such a note, but precludes recovery by him;

"(3) in a suit to recover on such a note the receiver of the bank is in no better position than the bank itself would have been."

In Yates Center National Bank v. Lauber, D.C., 240 F. 237, pursuant to an arrangement to help the officers conceal the financial condition of the bank, the bank turned over certain worthless notes to the defendant for his note, and agreed that it would at any time accept them in satisfaction of his note. The court refused to hold the defendant liable, saying:

(240 F. page 238) " * * * the illegality of the entire matter so clearly appears as to prevent a court of justice from affording any relief based thereon."

In Cutler v. Fry, D.C., 240 F. 238, the defendant was induced to give his note in exchange for the president's note, to help conceal defalcations of the president, under an agreement that the bank would at any time take the president's note in payment of the defendant's note. The court held that lack of consideration was a defense, and said:

(240 F. page 239) "However, the rights of the receiver of the bank to recover on the note in question rise no higher than the rights of the bank had insolvency not intervened. * * * But in the hands of the original payee, or its receiver, as is this case, both the note and the contemporaneous agreement constituted the entire contract between the parties, and, when the agreement thus formed is presented, the illegality of the whole matter so clearly appears the court will leave the parties where it finds them by refusing all relief. Rankin v. City National Bank, 208 U.S. 541, 28 S.Ct. 346, 52 L.Ed. 610; McMullen v. Hoffman, 174 U.S. 639, 19 S.Ct. 839, 43 L.Ed. 1117."

In Yates Center National Bank v. Schaede, D.C., 240 F. 240, affirmed without opinion by the Circuit Court of Appeals for the Eighth Circuit (240 F. 241), the court refused to enforce a note given to a bank without consideration to conceal the defalcations of its president, saying:

(240 F. page 240) "Not only is this defense [want of consideration] made out, but it further appears that the whole transaction, from the making of the original note to the renewal in controversy, was without consideration, and in pursuance of the illegal and criminal design of the president of the bank. Such state of facts public policy and good morals alike condemn, and courts refuse to enforce."

In Andresen v. Kaercher, 8 Cir., 38 F.2d 462, 464, the bank had a claim against the estate of one Kaercher and entered into an agreement with the defendants whereby the defendants deeded certain real estate to the bank (which was to be sold as soon as possible) and gave to the bank accommodation notes so that the bank might be able to show them as assets until the real estate should be sold. The trial court directed a verdict for the defendants, and this decision was affirmed on appeal.

The court answered the argument that the defendants had been guilty of a concerted attempt to deceive the national bank examiner and the Comptroller of Currency as to the exact financial condition of the bank in the following language:

(38 F.2d page 464) "But, be this as it may, the result is not affected, because the court will not lend its assistance in any way towards carrying out an illegal contract, nor will it enforce any alleged rights directly springing from such a contract. McMullen v. Hoffman, 174 U.S. 639, 19 S.Ct. 839, 43 L.Ed. 1117. In this view the bank itself could not have collected, nor is the receiver more advantageously situated."

In the case of Rankin, Receiver v. City National Bank, 208 U.S. 541, 28 S.Ct. 346, 52 L.Ed. 610, the president of a bank arranged with the defendant bank to discount his individual note and deposit the proceeds to a special account in the name of his bank (the Guthrie Bank) under an arrangement whereby these funds were not to be drawn against, but were to remain with the City National Bank until the note was paid. The purpose of this transaction was to effect a reduction of certain loans to which the examiner had objected as ex-

cessive. The president gave his bank a check on the City National Bank, the amount of which was credited to his personal account, and on the same day he gave his bank a check on his personal account, which was credited to bills receivable and the objectionable notes were taken out of the bank's assets. The receiver of the Guthrie Bank sued to recover the deposit to its credit which the City National Bank had offset against the note held by it on the day that the Guthrie Bank closed. It was agreed by the parties that the transaction between the banks was not illegal, but in affirming a decision in favor of the defendant bank, the court enunciated certain well-defined principles in the following language:

(208 U.S. page 545, 28 S.Ct. page 348) " * * * the whole business, from beginning to end was and was intended to be, a mere juggle with books and paper to deceive the bank examiner. The City bank never received anything from the Guthrie bank, the Guthrie bank never parted with anything to the City bank, or with anything for the loss of which the City bank is responsible, if it parted with anything at all."

(208 U.S. page 546, 28 S.Ct. page 348) "As between the banks, no one got any money; and the only benefit of the loan in fact or contemplation was a swindle upon the bank examiner. * * * If the Guthrie bank had sued while it was a going concern, it could not have recovered, and the receiver stands no better than the bank."

Also, see, Peterson v. Tillinghast, 6 Cir., 192 F. 287; Deitrick v. Standard Surety & Casualty Co., 1 Cir., 90 F.2d 862, 865.

The foregoing authorities, it is submitted, establish the rule that, where a note is given to a national bank without consideration and for its accommodation to conceal its true financial condition from a national bank examiner or the Comptroller's office, the maker may set up the defense of lack of consideration as against the receiver of a closed national bank. In an action by the receiver the courts will not enforce a note given as part of such an illegal transaction by the bank. Appointment of a receiver does not absolve such a note of the taint of illegality. His rights are in no way superior to the rights of the bank, and the time-honored principle denying enforcement of illegal obligations holds. The receiver is therefore barred from recovery on Greaney's note.

A different situation, however, exists where the receiver of a closed national bank undertakes to collect an assessment by a Comptroller against a person permitting stock of a bank to stand in his name on the books of the bank, or in the name of another for his benefit.

While neither a bank nor a receiver can collect a note given and accepted by the bank to deceive a national bank examiner as to an unlawful purchase of the bank's own stock, a suit by a receiver to collect an assessment by the United States Comptroller on the stock of the bank stands on a different footing. Such an assessment is lawful. It is independent of any method by which the stockholder acquired the stock. It is authorized by the National Banking Act, 12 U.S.C.A. §§ 191, 192, and falls on every person who in law may be treated as the owner of stock.

The assessment in this case was not made pursuant to any unlawful acts by the officers of the bank, in which they participated, Trustees of Somerset Academy v. Picher, 1 Cir., 90 F.2d 741, 744. Any judgment recovered on an assessment is not for the benefit of the bank, but is for the benefit of creditors of the bank. Dunn et al. v. O'Connor et al., 67 App.D.C. 76, 89 F.2d 820, 826; Page v. Jones, 8 Cir., 7 F.2d 541, 544, certiorari denied, 269 U.S. 587, 46 S. Ct. 203, 70 L.Ed. 426. It appearing that there are insufficient assets to discharge the liabilities of a closed national bank, the Comptroller of Currency under the provisions of the National Banking Act, may assess against each owner of a share or shares of the outstanding stock of a closed bank, or against any person whom the law regards as standing in the relation of owner, a sum, not exceeding the par value of such stock, which in the aggregate shall be sufficient to discharge the liabilities of the bank. R.S. § 5151, as amended by Section 23, 38 Stat. 273 (12 U.S.C.A. § 63); also see 12 U.S.C.A. §§ 63, 64, 191, 192; Harper v. Moran, 64 App.D.C. 210, 76 F.2d 980, 982.

Whether Karnow would have been liable for the assessment if the Boston-Continental stock had been standing in his name at the time of the assessment is immaterial, as his shares of stock, prior to the assessment, had been lawfully transferred to Greaney, who had them registered in the name of his son-in-law, Mahoney, and they remained in Mahoney's name on the books of the bank until this

suit was brought. Mahoney, when he learned what had been done, denied all knowledge of it, and the judgment in this case freed him and also Karnow of all liability on the assessment, Finn v. Brown, 142 U.S. 56, 12 S.Ct. 136, 35 L.Ed. 936.

When Ragan and Balter sought to purchase shares of the Boston National Bank stock in order to carry through their plan for the consolidation of the Boston National Bank and the Continental National Bank, after some preliminary negotiations, they signed three notes in the total principal amount of $24,000, which were given to Greaney to discharge any obligation Karnow had assumed by giving his accommodation note to the bank and to acquire for them the shares standing in the name of Karnow, which it was originally suggested should be held as security for his note given to the Boston National Bank and which was found among the assets of the consolidated banks.

When the first of the three notes came due, Ragan and Balter notified Greaney to have Karnow deliver up sufficient shares of the Boston-Continental National Bank stock to represent the face of the due note, i. e., $9,500, at the price agreed upon between Ragan and Balter and Ulin and Greaney. Karnow, thereupon, on payment of the note, surrendered 226.8 shares of the Boston-Continental stock, which was turned over to the bank, or Ragan and Balter, and Karnow received credit at the bank on his note for the amount.

Karnow then insisted that he be relieved of further responsibility, if any, on the balance of his accommodation note held by the bank, and it was finally arranged with Greaney and the bank, through Ragan and Balter, that Greaney would take over the balance of the Karnow note of $14,553.66; whereupon Greaney signed a new note to the bank for that amount and the Karnow stock was delivered to Greaney, who had the stock transferred directly into the name of his son-in-law, Mahoney, but, as stated above, without Mahoney's knowledge or consent.

Greaney now held two notes of Ragan and Balter for which he had agreed to transfer to them, when paid, the remaining 457.2 shares of Boston-Continental stock formerly held by Karnow, though now registered on the books of the bank in the name of his son-in-law, Mahoney, and on payment of which the note given by Greaney in discharge of Karnow's note

would be cancelled. Ragan and Balter would then presumably have acquired the stock which they coveted, and Greaney would be relieved of any liability on his note given to remove Karnow's name from any paper held by the bank.

■ The District Court held that as to the assessment by the Comptroller, Greaney must be regarded as the beneficial owner of this stock. We think that he stood in that relation as to the receiver suing to collect an assessment by the Comptroller. Having registered the stock in Mahoney's name, without Mahoney's knowledge, Greaney cannot thereby in this suit escape any liability that would follow if the stock was registered in his own name. Greaney cannot now deny whatever liability followed from permitting the stock to remain on the books of the bank in the name of Mahoney for his benefit.

When the second note of Ragan and Balter came due, Greaney signed a transfer of some of those shares standing in Mahoney's name without consulting Mahoney, and redelivered to the bank certificates for the stock to be delivered to Ragan and Balter in consideration of the payment of their second note. On their failure to make payment for the note, the certificates were delivered to Greaney. He then brought suit on their note. We think there was sufficient evidence to warrant the District Court in holding that Greaney, with respect to the assessment against him, and after the giving of the Ragan and Balter notes and transfer of the stock to him, had control over this stock.

■ But, assuming that the stock resulted from the unlawful transaction between him and the Boston National Bank by which Karnow was prevailed on to give his accommodation note to the bank, and that these shares of stock were turned over to Karnow as security for the note which he had given to the bank, and that Greaney took the stock and note from Karnow as an accommodation note with whatever defects or defenses Karnow might have had as against the bank, we are not now considering a claim of the bank or its receiver based on Greaney's note, but as against a Comptroller's assessment and a suit by a receiver to collect it. Greaney could not rely on any defenses he or Karnow might have had against the receiver in a suit on the note originally given to the bank as an accommodation and without consideration. If Karnow had held the stock registered in his

name after the assessment was made, he might have been liable for the assessment as the' owner of the stock, but Karnow had previously transferred it in good faith to Greaney. By Greaney's order it was registered in the name of his dummy, Mahoney, but in equity it is regarded as though registered in Greaney's own name.

■ Greaney's status in the suit by the receiver to collect the assessment is not affected by his participation in the unlawful transaction between him, Ulin and the Boston National Bank. The Comptroller was not a party to any unlawful transaction. On this branch of the case Greaney is not sued on his note by a party equally guilty as himself of unlawful acts. The imposition of the liability for the assessment of the Comptroller is statutory and is independent of any liability of Greaney on his note or lack of it. Greaney as against the lawful acts of the Comptroller could not set up as a defense an unlawful transaction in which he participated, but in which the Comptroller did not participate. When Greaney again finally acquired this stock, he had it registered in the name of a dummy who appeared on the books of the bank as the owner. The question is, can Greaney, under these circumstances, deny ownership of this stock in the action by a receiver of a closed national bank to collect an assessment by a Comptroller? We think not.

The agreement with Ragan and Balter was a new and independent transaction, which, so far as appears in the record, has nothing to do with the method by which Greaney, or Karnow, acquired the bank stock. Ragan and Balter wanted the stock standing in Karnow's name to ·carry through their plan of consolidation of the two banks. They entered into· what appears to be a legitimate transaction with Greaney to acquire for them the· stock standing in Karnow's name, agreeing· to pay therefor an adequate price, which would also have enabled Greaney to discharge his note given as a substitute for Karnow's. Notes of Ragan and Balter were delivered to Greaney, from the proceeds of which as they came due and on the delivery of the stock he was to discharge Karnow on his note at the bank. Greaney, to satisfy Karnow, arranged to take over the balance of Karnow's note, for which he was, at least, morally responsible.

In effect, under such circumstances, the law regards the stock registered in the name of his dummy, Mahoney, as standing in the name of Greaney. Greaney allowed it to remain in Mahoney's name on the books of the bank. Equity will not permit Greaney to escape liability by such a subterfuge.

■ The authorities are in accord that the beneficial or actual owner of the stock is liable for an assessment by the Comptroller, the stock being registered in the name of another.

In McCandless v. Haskins et al., 8 Cir., 28 F.2d 693, 694, the court said:

"Some contention is made by plaintiff that the bank was without power to purchase its own capital shares. While this may be true, yet that is not the decisive question in this case. The plaintiff charged in its petition the defendants owned the shares in question, and, because they owned the same, were liable for the assessment."

The general rule covering the liability of stockholders is stated in Welles v. Larrabee, C.C., 36 F. 866, 869, 2 L.R.A. 471:

"The liability sought to be enforced is purely statutory, and the declaration of the statute is that 'the shareholders of every national banking association shall be held individually responsible, equally and ratably, and not one for another, for all contracts, debts, and engagements of such association to the extent of the amount of their stock therein at the par value thereof,' etc. Section 5151, Rev.St. [now 12 U.S.C.A., Sec. 64]. To be liable, the party charged must be a shareholder, and by the construction placed upon these and similar provisions in other statutes it is held that the actual shareholder cannot escape liability by placing the legal title of his shares in the name of a third party."

In Forrest v. Jack, 294 U.S. 158, 162, 55 S.Ct. 370, 371, 79 L.Ed. 829, 96 A.L.R. 1457, the court said:

"The liability of stockholders is based upon the statute, 12 U.S.C.A. § 64. As a general rule, the person in whose name the stock stands on the books of the bank is liable, but the actual owner may be held although the stock has not been registered in his name."

Also, see, Ohio Valley National Bank v. Hulitt, 204 U.S. 162, 27 S.Ct. 179, 51 L.Ed. 423; Durance v. Collier, 5 Cir., 81 F.2d 4; Early v. Richardson, 280 U.S. 496, 50

S.Ct. 176, 74 L.Ed. 575, 69 A.L.R. 658; McDonald v. Dewey, 202 U.S. 510, 26 S. Ct. 731, 50 L.Ed. 1128, 6 Ann.Cas. 419; 9 C.J.Secundum, Banks and Banking, § 589, p. 1114; Germania National Bank v. Case, 99 U.S. 628, 631, 25 L.Ed. 448.

■ There is no merit in the contention that the case should have been transferred to the law side. It presented complicated questions as to ownership of the stock of these banks and fraud is involved, which is a ground of equity jurisdiction. In any event, the defendant does not seem seriously to press his contention. Nor was its motion to transfer to the law side presented in limine. Its bill of complaint was filed March 11, 1936. His motion to transfer was not made until November 15, 1937.

■ "The want of equity jurisdiction, if obvious, may and should be objected to by the court of its own motion. [Twist v. Prairie Oil & Gas Co., 274 U.S. 684, 690, 47 S.Ct. 755, 71 L.Ed. 1297]. In other cases, this jurisdictional requirement, unlike the others mentioned, may be treated as waived if the objection is not presented by the defendant in limine. Duignan v. United States, 274 U.S. 195, 199, 47 S.Ct. 566, 71 L.Ed. 996." Matthews v. Rodgers, 284 U. S. 521, 524, 525, 52 S.Ct. 217, 219, 76 L.Ed. 447.

■ "Equity jurisdiction may be invoked where there are complicated matters and interests, and degrees of interests involved, and where fraud upon creditors is involved in the transfer which is assailed. * * * Adams v. Clarke, C.C.A., 22 F.2d 957; Corker v. Soper, C.C.A., 53 F.2d 190; McDonald v. Dewey, 202 U.S. 510, 26 S.Ct. 731, 50 L.Ed. 1128, 6 Ann.Cas. 419. While the appellants denied in their answer the equity jurisdiction of the court, yet they made no resort to the usual procedure of a motion to dismiss the petition or to transfer the case to the law docket, and seemingly acquiesced in the equity proceedings. However this may be, it is clear that this case is one essentially for equitable cognizance." Metropolitan Holding Co. v. Snyder, 8 Cir., 79 F.2d 263, 268, 103 A.L.R. 912.

The decree of the District Court, in so far as it holds Greaney liable on his note for $14,553.66 is reversed, and a decree may be entered dismissing the suit as to Greaney in so far as it involves his liability on this note. The decree of the District Court is affirmed as to Greaney's liability in the amount of $9,144, the amount of the assessment on the 457.2 shares of stock of the Boston-Continental National Bank, with interest to the date of judgment.