KEYES v. FIRST NAT. BANK OF ABERDEEN, S. D.

District Court, D. South Dakota. June, 1927.

1. Banks and banking ⊚⟹109(1)—Notes executed by bank officers to correspondent bank held to constitute "bank transaction," authorizing correspondent bank to charge account of other bank on maturity.

Notes executed by bank president, in sole management and control and active charge of its affairs, and by other bank officers to correspondent bank for purpose of securing funds for bank held, in view of custom and reconcilements showing that both parties intended notes for use of bank, to constitute a "bank transaction," and not a personal loan, so that correspondent bank was justified in charging the amount of such notes on maturity to account carried with it by bank for whose use notes were executed.

2. Banks and banking ⊚⟹102—Reconcilement with correspondent bank, signed by officers who were also nominal makers of note included in such reconcilement, held binding on bank for which money was borrowed on note.

Reconcilement by cashier and vice president, covering transaction whereby correspondent bank charged notes executed by bank president and vice president, signing reconcilement to bank's account, constituted an act of the bank binding on board of directors, who were in duty bound to examine accounts, since reconcilements were made in ordinary course of business by such vice president, who, although signing notes, was only a nominal maker for use of bank.

3. Banks and banking ⊚⟹77(4)—Bank receiver held estopped to assert claim against correspondent bank charging notes executed for use of bank by its officers, to bank's account.

Where notes executed by bank officers to correspondent bank were treated by all parties thereto as constituting a bank transaction, and not personal obligation of makers, receiver is estopped to assert claim against correspondent bank because of its action in charging such notes to bank's account, in that receiver stands in no better position than bank, if bringing action itself.

4. Account stated ⊚⟹6(1)—Cash letters and reconcilement statements covering notes executed by bank officers to correspondent bank and charged to bank's account constituted "account stated."

Transaction between bank and correspondent bank, consisting of forwarding of cash letters and exchanging reconcilements covering notes executed by bank officers and charged by correspondent bank to bank's account on maturity, held to constitute an "account stated," in that such letters and reconcilement sheets and statements contained all items included within transactions of all character between banks.

[Ed. Note.—For other definitions, see Words and Phrases, First and Second Series, Account Stated.]

5. Banks and banking. ⊚⟹77(4)—Receiver cannot recover against correspondent bank on notes executed by bank officers and charged to bank on maturity, on theory of conspiracy to conceal liabilities.

Receiver for closed bank held not entitled to recover on notes executed by bank officers to correspondent bank and charged to bank's account on maturity, on theory of conspiracy between bank and correspondent to conceal liability of borrowing bank, in that bank while a going concern could not have maintained action therefor, and receiver stands in no better position.

6. Banks and banking ⊚⟹114—Receiver for insolvent bank cannot recover against correspondent bank payments on personal loan to president of insolvent bank after acceptance and reconcilement.

Where president of bank paid interest on personal loan from correspondent bank by check or draft in certain instance, and in other instances correspondent bank charged account to bank of which borrower was president, and all items were remitted by correspondent bank and accepted and reconciled by proper officer of bank other than president, receiver after bank's insolvency held not entitled to recover such payment against correspondent bank, particularly since payments were charged to account of borrower, and in each case he had credit to cover charge.

7. Banks and banking ⊚⟹114—Directors' acquiescence in bank president's use of bank funds in paying personal obligation conferred authority on him to do so.

Directors' continued acquiescence in bank president's using bank funds in payment of personal obligation with knowledge which they could and would have had, had they performed their duties, held to have conclusively conferred authority on president to use bank funds.

In Equity. Action by Paul C. Keyes, as receiver of the First National Bank of Eureka, S. D., against the First National Bank of Aberdeen, S. D. Judgment for defendant.

McNulty, Williamson & Smith, of Aberdeen, S. D., for plaintiff.

Crofoot & Ryan, of Aberdeen, S. D., and Lancaster, Simpson, Junell & Dorsey, of Minneapolis, Minn., for defendant.

ELLIOTT, District Judge. I have reviewed the record and briefs in the above-entitled matter and find the facts in this record undisputed. I find no contention on the part of counsel as to any material facts in the record.

Plaintiff states its five separate causes of action as receiver of the First National Bank of Eureka, successor to the German Bank of Eureka, and against the First National Bank of Aberdeen, to recover $37,466.70, which plaintiff alleges was paid to the defendant bank by the First National Bank of

Eureka and the German Bank of Eureka, which the former succeeded, in payment of the personal indebtedness of one Christian Vorlander, president of the said German Bank and thereafter of the First National Bank of Eureka. The first four causes of action are, for practical purposes, alike, and the fifth is for interest paid upon what is conceded to have been a personal obligation of said Vorlander, president of the Eureka Bank, to the defendant bank.

While the facts are undisputed, counsel for the respective parties do not agree with the inferences naturally and legitimately to be drawn from the undisputed facts, and therefore disagree as to the conclusions of law applicable thereto. In my view of the situation presented, in the light of the uniform decisions of the courts, not only in this judicial circuit, but of the different circuits and the United States Supreme Court as well, the rights of the parties are determined largely by a proper interpretation of the real intent and purpose of the parties to the transactions made the basis of plaintiff's causes of action.

Plaintiff urges a recovery upon the theory that Vorlander was indebted to the Eureka Bank by reason of hidden defalcations, and urges that he gave his personal and individual note to, and borrowed money from, the defendant bank which he placed to his credit in the Eureka Bank, and urge further that this credit was applied by operation of law upon the existing indebtedness of Vorlander to the Eureka bank. It is further urged that upon maturity of the notes so given upon the authority of Vorlander the defendant bank charged the amount of the notes, respectively, with interest, against the account of the Eureka bank, there being at the time a credit balance in favor of the Eureka bank on the books of the defendant bank which was a depository of the Eureka bank. Upon this situation it is urged by the plaintiff that the defendant bank thereby took funds of the Eureka bank in payment of Vorlander's personal obligation, knowing the funds to be the property of the Eureka bank.

The defendant urges as a defense to the first four causes of action of the plaintiff:

(1) That the loans were made to the Eureka bank, in the first instance, secured by notes of Vorlander, and in the other transactions by other officers of the bank, and that in each of these transactions the note was given by, and the credit extended to, the Eureka bank and the money credited to its account, and thereafter paid out upon the checks and drafts and for the benefit of the Eureka bank.

(2) That the Eureka bank having obtained and used the proceeds of the loans, respectively, was liable for money had and received.

(3) That the Eureka bank, accepting the charges against its account by its postcards assenting to such charges, and by permitting payments of such obligations to be made by bank funds over a period of years, including a time long prior to the transactions named in plaintiff's complaint, during all of which time the defendant bank was the depository of the Eureka bank, the Eureka bank thereby represented that the transaction was a bank obligation, and further represented thereby that Vorlander had authority to use bank funds in the payment of such obligations; that the defendant bank relied upon these representations to its prejudice; that it made the loans involved upon the strength of these representations and did not pursue its remedies against Vorlander or the other signers of the different notes, and defendant urges that the Eureka bank is therefore estopped from showing that the obligation is not a bank obligation, or that the use of bank funds was not authorized in payment of these obligations.

(4) That by its reconcilement sheets, approval of cash letters, and the entire correspondence between the defendant bank and the Eureka bank whereby the defendant bank sent to the Eureka bank monthly statements of the account of the Eureka bank as it appeared upon its books, obtaining a reconcilement from the Eureka bank, the latter forwarding to the defendant bank in each instance a statement admitting the correctness of the account, except for discrepancies noted thereon, there was an account stated between the banks; that this course of dealing had for its intent and purpose and actually constituted an account stated between the banks, and in the absence of fraud or mutual mistake this account stated cannot be impeached.

(5) Defendant urges that upon the undisputed facts in this case, considering the correspondence which was the basis of each of the transactions in the first four causes of action stated in the complaint, considering the long course of dealing between the defendant, as the depository, and the Eureka bank as the depositor, involving similar loans that had been paid by the Eureka bank, not only to the defendant bank but to other banks to the knowledge of the defendant bank, the directors of the Eureka bank were and are chargeable with notice of this course of dealing, first, because it had continued over such a long period, and, second, because of the

knowledge of other officers, particularly of those officers, including the cashiers, who had the entire charge and management of the business of the Eureka bank, and there was conferred upon Vorlander apparent authority to use bank funds in payment of these obligations.

(6) Defendant urges that, even though the obligations set forth in plaintiff's first four causes of action were personal obligations of Vorlander, and conceding that the defendant bank knowingly received the Eureka bank's funds in payment, notwithstanding all of this, upon the face of this record, as between the defendant bank and Vorlander, it was Vorlander's primary obligation to the Eureka bank, and it was his duty to pay the amount of money so used. Defendant urges that Vorlander did so by applying a part of his credit on the books of the Eureka bank in payment of these obligations.

(7) The defendant further urges that, assuming that the defendant bank took funds belonging to the Eureka bank, knowing them to be bank funds, in the transaction of all of the business between the Eureka bank and the defendant bank, it was the practice, and in each instance, as a matter of fact, the defendant bank did charge against the account of the Eureka bank, in the transaction of their business and in the regular course of their dealing, certain items, including items within the causes of action set forth in the complaint, which charges on the books of the defendant bank were only tentative, and a cash letter was in every instance at once mailed by the defendant bank to the Eureka bank notifying it of the charge, and which said charge on the books of the defendant bank was made subject to the approval and consent and ratification of the Eureka bank, and only became a permanent charge against the said Eureka bank when acknowledgment was received from the Eureka bank, whereupon all items not objected to were permanent charges; that in each instance where an item was charged to the account of the Eureka bank by the defendant bank, and there was objection to it, or it had not been collected, upon receipt of notice thereof, the same was credited back by the defendant bank to the Eureka bank; that, as a matter of fact, therefore, considering the method and manner of dealing, in each and every instance where charges were made to the account of the Eureka bank by the defendant bank, it was only a conditional charge and in effect the claim involved in such charge was in fact, by the cash letter, sent as an item to the Eureka bank for collection, and thereupon

the Eureka bank, by acknowledging the charge as a proper one, represented to the defendant bank that the items had been collected by it, and that the charge should be made permanent.

Upon a review of the record in the case, in the light of the claims and arguments presented by counsel for plaintiff, together with those of counsel for defendant, I am impressed that there is little room for controversy, other than an interpretation of the letters constituting the four separate transactions set forth in plaintiff's complaint, viewed in the light of the intent and purposes of the defendant bank and the officers of the Eureka bank as affected by existing conditions and relations that then and for a long time had existed between them, the knowledge or lack of knowledge of the defendant bank of the course of dealing of Vorlander, president of the Eureka bank, with that bank.

Counsel for plaintiff starts out with the proposition that of course these were personal obligations of Vorlander, for himself, understood by the defendant bank to be his own loans and to be used for his own purposes. Counsel urge that this was the understanding of the defendant bank, and that with this knowledge they loaned him the money for his own purposes and permitted him to take the funds of the bank to pay his own obligations. This is denied by counsel for defendant bank, and they refer to the record, and urge that the entire transaction was in writing, and there is, therefore, no room for dispute. This I find to be the fact.

Taking the first cause of action, the record discloses that it originated with a letter to the defendant bank, dated June 25, 1917, signed by C. Vorlander, president, as follows:

"We need your assistance for about 30 days, and I am enclosing a note for $10,000, signed by myself and Mr. Pufahl. Kindly credit our account with the same. Wool is accumulating here, and besides the county treasurers have remitted to the state treasurer, and we have seen some heavy drains for the last 10 days. We will have plenty of funds about the middle of July, as we are holding certificates of deposit against some national banks in the state and state banks in North Dakota, but they do not mature before July 15th, or about that time. * * * The reason we signed this note personally is because we do not want to show the loan on our books as 'Bills Payable,' and we will soon have to make another statement."

On the next day Pufahl, cashier, wrote the defendant bank a letter inclosing two

notes in the sum of $5,000 each, executed by Pufahl and indorsed by Vorlander, and these notes were received by the defendant bank on June 17, 1917, and thereupon defendant bank returned the $10,000 note referred to in Vorlander's letter above set forth. On the same date the defendant bank entered a credit on its books in favor of the Eureka bank for $10,000, the proceeds of these two notes, debited its account called "Loans and Discounts" in the same sum. The record discloses that on June 25, 1917, the Eureka bank, by Pufahl, entered on its books a debit or charge against the defendant bank, including the $10,000 represented by the two notes in question, and also on its books credited Vorlander with $10,000. These two notes for $5,000 each matured July 26, 1917. On July 25, 1917, the defendant bank wrote to "C. Vorlander, President, the German Bank, Eureka, S. D.," stating that the defendant bank would charge "your account" with $10,050 on July 26th, and inclosing the two $5,000 notes. On July 26, 1917, the defendant bank debited or charged the Eureka bank on its books with the sum of $10,050, and credited "Loans and Discounts" with a sum including these two $5,000 notes, and its account "Interest" with a sum including the item of $50 interest on the two notes. On July 31st, Pufahl credited the defendant bank on the books of the Eureka bank in the sum of $10,466.56, which was in payment of the two notes in question, with interest in the sum of $50, together with other items, and debited Christian Vorlander's personal account with $20,000, including the $10,000 in question, and further debited an account called "Interest" with an item including the $50 interest paid on these two notes for $5,000 each.

The record without dispute thus discloses that the Eureka bank received and used for its legitimate corporate purposes the credits and funds provided by the defendant bank in discounting the two $5,000 notes in question. This credit was drawn upon and checked out by the Eureka bank from the defendant bank for its own purposes and in the usual, ordinary routine of business, and used in the payment of its obligations. The record further discloses that a postcard signed by the Eureka bank was mailed and received by the defendant bank acknowledging the charge of the two $5,000 notes and interest made by the defendant bank, the same constituting a reconcilement by the Eureka bank, acknowledging the correctness of the credit of the proceeds of the notes and the charge of the principal and interest at maturity after receipt by the Eureka bank of the cash letter

from the defendant bank notifying it of such tentative charge.

The second cause of action began with a letter of the defendant bank, dated August 11, 1917, signed by C. Vorlander, president, as follows: "Again I have to call on you for assistance for 30 days. I didn't think I would have to do this, but we have an awful demand for money here. Our county is spending about $100,000 for road work and all banks in the county have been relieved of county funds. * * * Will have plenty of funds soon and you can rest assured our balance with you will soon look like good old times. Kindly credit our account with the inclosed note."

The defendant bank replied to the foregoing letter under date of August 13, 1917, and stated that the defendant bank was crediting "your account" with the proceeds of the note signed by Vorlander and Pufahl and inclosed in the letter of August 11th. Thereafter on September 19, 1917, the defendant bank addressed to "C. Vorlander, President," a letter notifying the Eureka bank of the charge of $10,058.33 against "your account," being the amount of the Vorlander and Pufahl note, with interest. This letter also refers to a letter from the Eureka bank of September 13th, requesting this charge to be made, and which letter does not appear in the record. On August 13, 1917, the defendant bank credited the Eureka bank with $10,000 and debited "Loans and Discounts" in the same amount. On September 19th it credited "Loans and Discounts" $10,000 and "Interest" $58.33, and on September 20th debited the Eureka bank $10,058.33. The Eureka bank on August 11th debited the defendant bank $10,000 and credited Vorlander with a like amount. On October 31st it credited the defendant bank with $10,058.33, debited "Loans and Discounts" with $10,000 and "Interest" with $58.33. At the end of the month the defendant bank sent to the Eureka bank a statement of its account, showing this credit of $10,000 under date of August 13th, followed by the word "note," and M. J. Pufahl, cashier of the Eureka bank, executed and returned to the defendant bank a reconcilement, recognizing and affirming the credit. At the end of the month of September, the defendant bank forwarded to the Eureka bank a statement of its account for the month of September, showing a charge on September 20th, $10,058.33, followed by the word "note." Pufahl, cashier, thereupon executed and forwarded the defendant bank a reconcilement of this statement, recognizing and affirming the charge.

The third cause of action began with a letter to the defendant bank, dated June 12, 1919, signed by the German Bank of Eureka, by C. Vorlander, President, saying: "We have a heavy demand for money here recently, and we would thank you if you would credit our account with the enclosed note for a short time. We have considerable money in view to come in within the next three weeks and as soon as we get that we will take up the note. You may either let the interest run until we take up the note, or you may charge our account with the discount until August 1st, and if we take up the note before that time, credit our account with the unused interest."

To the letter the defendant bank replied in substance that the proceeds of the note, which was signed by Vorlander, Sprick, and Shaefer, the latter two employees of the bank, was placed "to your account." This note was renewed from time to time, and was finally charged against the account of the Eureka bank, under instructions contained in a letter signed by "C. Vorlander, President," dated December 19th. The record discloses that on June 13, 1919, defendant bank credited the Eureka bank $9,897.92, being the proceeds of the note signed as above stated, and on the same date credited "Interest" $102.08, and debited "Loans and Discounts" with $10,000. August 2 defendant debited the Eureka bank with $2 revenue stamps. On September 18th, when the note was renewed, the defendant bank debited the Eureka bank with the amount of interest, $88.77, and credited its interest account with the same amount. December 20th, at the time of the payment of the note, it debited the Eureka bank with $10,171.50, the amount of the note and interest, and credited "Loans and Discounts" $10,000, and "Interest" $171.50. June 12, 1919, the Eureka bank debited the defendant bank $10,000, and credited "Loans and Discounts" $10,000. On June 21st, it credited the defendant bank $104.08, being the amount of interest and on the same date debited "Interest" in like amount. August 4th it credited the defendant bank $2, for revenue stamps. On September 25th it credited the defendant bank $88.77, and debited a like amount to "Interest." December 23d at the time of the payment of this note the Eureka bank credited the defendant bank $10,171.50, and debited "Loans and Discounts" $18,371.59, which included this $10,000 note, and debited "Interest" $171.50.

It further appears that these entries were all made by the employees and officers of the bank, Shaefer, Kundert, and Sprick, and none of them by Vorlander, and were entered in the usual course of business of the bank. In June, 1919, defendant bank sent to the Eureka bank a statement of its account, showing a credit on June 13th for "note disc." in the sum of $9,895.92, which credit was at once acknowledged in the reconcilement signed "Sprick, Cashier." The statement of the account of the Eureka bank on the books of the defendant bank for the month of August, shows $2 debited for revenue stamps on August 7, which debit was approved in reconcilement signed by Pufahl, vice president of the Eureka Bank and forwarded to the defendant bank. The statement of the Aberdeen bank for the month of September shows a debit on September 18th of $88.77 interest then due. Reconcilement sheet, signed by Sprick, cashier, acknowledges this debit. Statement sent out by defendant bank in December, 1919, shows charge on December 20th of $10,171.50, followed by the word "note." This was approved and accepted by reconcilement signed by Pufahl, vice president, and forwarded to the defendant bank. In this instance, the initial letter in this transaction was signed "German Bank of Eureka, by C. Vorlander, President."

The fourth cause of action began with a letter from the Eureka bank to the defendant bank, dated May 1, 1920, as follows: "The 1st of May settlements for trucks, tractors, and other implements are making heavy drafts on us and we would like to have your assistance for 15 days by crediting our account with the enclosed note. We have considerable money coming in within a week or 10 days and will surely take up this note by the 18th."

The note inclosed was for $5,000 and signed by C. Vorlander, A. Sprick, and M. J. Pufahl, the president, cashier, and vice president of the Eureka bank. In reply to this letter the defendant bank wrote to the Eureka bank that it was crediting the Eureka bank account with the proceeds of the note, and the correspondence as to the details of the loan is in every particular identical with that in the other three causes of action. May 3d the defendant bank credited the Eureka bank with $4,999, the proceeds of the $5,000 note less $1 for revenue stamps, and the same date debited "Loans and Discounts" $5,000. June 3d it debited the Eureka bank $5,040.14 and credited "Loans and Discounts" $5,000, and credited "Interest" $30.14. May 1st the Eureka bank debited the defendant bank $5,000, and credited Vorlander with the same amount, and June 8th it credited defendant bank with $5,030.14, debited "Loans and Discounts" with $5,000 and "interest" $30.14.

The cash letter was duly mailed and statement of account sent out by the defendant bank for the month of May. This credit was accepted and reconcilement duly executed by Pufahl, vice president, and mailed to the defendant bank. Statement of the defendant bank for the month of June shows the debit of this note and interest, and the interest was forwarded to the Eureka bank by an item in the cash letter, was affirmed and accepted by the Eureka bank in its reconcilement signed by Pufahl, vice president.

The fifth cause of action is different, and in my judgment, because it is different, throws light upon the character of the transactions involved in the preceding four causes of action, and emphasizes the intent, purpose and understanding of all of the parties to all five of these transactions. This fifth cause of action is founded upon what is clearly a personal transaction of Vorlander, and was initiated by letter to the defendant bank, dated March 13, 1916, as follows:

"I made a big land deal and need your help for a short time. I herewith inclose a note for $10,000 which please place to the credit of the German Bank, and, if it is not contrary to your rules, I wish you would not take out the discount and make me as low a rate as possible. I think I can take it up soon. Should you desire collateral, advise me and I will send some. Trusting you will favor me with the accommodation, I am,

"Yours truly,
"C. Vorlander, President."
"We have plenty of funds in the bank. This is for my own purpose."

In this fifth cause of action plaintiff seeks to recover money paid on eight different occasions as interest on the note named in the foregoing letter, claiming that the funds with which these payments were made were funds of the Eureka bank, and were known to be such by the defendant bank. This note is concededly a personal obligation of Vorlander, and the money was to be for his own use and accommodation.

The first of the payments sought to be recovered by plaintiff was made on May 16, 1918, in the sum of $400, and was paid by Vorlander's check drawn on the Eureka bank, delivered by him to the defendant bank and forwarded by it in a cash letter with other items to the Eureka bank for collection. Reconcilement, signed by A. Sprick, cashier, for the month of May, 1918, passed upon and accepted a debit of $2,212.13 entered by the defendant bank on May 16th, being the amount of the cash letter, including Vorlander's $400 check.

The second payment was made December 6, 1918, in the sum of $370.33, and was paid by draft drawn by the defendant bank on C. Vorlander, and forwarded to the Eureka bank for collection. Statement of the defendant bank for December shows a debit on December 6th in the sum of $854.17, the amount of the cash letter, including the draft, which was reconciled by Sprick, cashier.

The third payment is on March 19, 1919, in the sum of $308.03, and was made by a draft drawn on Vorlander by the defendant bank, sent to the Eureka bank for collection in a cash letter, and the statement of the defendant bank for March, 1919, shows the debit to the Eureka bank on March 19th, in the sum of $2,591.98, being the total of the cash letter, including the draft on Vorlander. The reconcilement accepting and approving this debit was signed by Sprick, cashier.

The fourth payment was in the sum of $168.11, was made July 31, 1919, by Vorlander's check on the Eureka bank. It was sent by the defendant bank to the Eureka bank for collection in the cash letter of July 31, 1919. The statement of July, 1919, shows a debit to the Eureka bank of $1,730.46, the amount of the cash letter including the Vorlander check. This was approved by reconcilement by Pufahl, vice president, setting it out in the reconcilement, though it was not entered on the books of the Eureka bank until the month of August.

The fifth payment, $168.11, was made by a charge upon the books of the defendant bank against the account of the Eureka bank, October 24, 1919, and notice given by letter to "C. Vorlander, President, German Bank of Eureka." The defendant bank's statement for October, 1919, to the Eureka bank, showed a debit to interest in the sum of $168.11, on the 24th of October, and reconcilement approving the same was signed by Pufahl, vice president, and mailed to the defendant bank.

The sixth payment, $175, was made February 5, 1920, by C. Vorlander's check, drawn on the Eureka bank. This was forwarded to the Eureka bank for collection in the cash letter of February 6, 1920. The statement of the defendant bank for February shows the debit on February 6th against the Eureka bank in the sum of $436.30, the amount of the cash letter, including the check in question. Reconcilement forwarded by the defendant bank to the Eureka bank was signed and returned by M. J. Pufahl, vice president, thereby admitting the charge.

The seventh payment in the sum of $178.94, dated May 1, 1920, was made by a charge on the books of the defendant bank against the Eureka bank on directions from Vorland-

er. Notice of this charge was given in the letter to "C. Vorlander, President of the First National Bank of Eureka." Statement of the defendant bank for May shows a .debit of $178.94. Reconcilement sheet for this month was signed by M. J. Pufahl, vice president, of the Eureka bank, and forwarded to the defendant bank, affirming and admitting this charge.

The eighth payment, $193.66, on July 19, 1920, made by a charge against the Eureka bank, and statement for the month of July shows a debit on July 19th, "Interest and Rev.," $193.66. Reconcilement sheet thereafter signed by M. J. Pufahl, vice president, and forwarded to the defendant bank allowing this charge. Each of these payments were charged by the Eureka bank to Vorlander's account, which had sufficient credit on the books of the Eureka bank to meet the charges.

In determining the issue thus presented, the first question is: Do the first four causes of action involve bank transactions, or were they personal loans?

[1] In determining this issue it is important to note that the record discloses that during the entire time covered by these transactions and for a long time prior thereto, Vorlander was president of the Eureka bank, in the sole management and control and active charge of its affairs. As was common in those days with the ordinary country bank this Eureka bank was a one man bank and that man was Vorlander. The Eureka bank had kept its account with and was a correspondent of the defendant bank, and continuously for a number of years carried a balance to its credit in that bank of reserve and carrying on its banking transactions in the usual, ordinary way common to banks in that vicinity. The Eureka bank was what is known as a country bank; the defendant, a city bank. The Eureka bank, for a long period of time prior to the date of the transactions involved in this action, borrowed from the defendant bank, and from its other correspondents with the knowledge of the defendant bank, sums of money from time to time as the interest of the Eureka bank demanded and for its use and benefit, which sums were borrowed upon the collateral notes of the officers of the bank, Vorlander and others, and the business transacted in that way for the express purpose of raising money for the use and benefit of the Eureka bank, and at the same time to avoid the necessity of showing in the report to the public examiner the borrowing of funds by the Eureka bank.

The record shows without a suspicion of a doubt that the directors of the Eureka bank knew nothing of the business of the bank, took no part in the direction of its policies, and knew nothing of the details of its business, hardly even attending the annual meetings, and when there was an attendance of a quorum the simple general report of Vorlander was accepted. The entire authority of the bank and the transaction of its business, the policy of the bank, and everything connected with it, was vested in Vorlander in so far as it is possible for directors of an institution of that character to do so. It is conceded on the face of the record that Vorlander was, for a series of years before the failure of the Eureka bank, juggling its accounts, and extending to himself credit, and using the property of the bank for his own purposes. The record nowhere shows any pretense that the other officers of the bank knew of his manipulation of the funds of the bank, or of his dishonesty in its management, and neither of the other officers of the bank was guilty of any misconduct with reference to the funds of the bank or the keeping of its books or papers. It further appears from the record that there was in that vicinity a common custom of borrowing money by the officers of country banks for their banks, respectively, from their correspondents, putting up their own notes as collateral to the amount borrowed, for the purpose and with the intent in that way to loan the country bank money and at the same time prevent the necessity of the country bank showing borrowed money upon the report to the public examiner, and this was known and understood by all of the parties to the transactions in question.

Under these circumstances, what were these transactions represented in the first four causes of action set forth in plaintiff's complaint? The testimony of all of the officers of the defendant bank is undisputed that they understood and believed that the loans included in the first four causes of action herein were made under this well-known custom and practice, and that the same in truth and in fact were loans to the Eureka bank and were the obligations of the Eureka bank, and that payments were made of obligations of the Eureka bank, and not of the personal obligations of its officers. The record discloses that the Eureka bank had, prior to that time, borrowed money from the defendant bank in precisely the same way, and these loans to the Eureka bank had always been paid with funds of the Eureka bank. The funds placed to the credit of the Eureka bank as a result of the discount of the notes in question in this suit were not treated in any other or different manner than other

funds of the Eureka bank deposited with the defendant bank. It clearly appears that the officers of the defendant bank made the loans in question here in this manner, relying on the long-continued practice of loaning money in this way to the Eureka bank for its own use and benefit.

It is just as clear from the record that the officers of the Eureka bank, excepting Vorlander, who committed suicide prior to the closing of the Eureka bank, that every one of these officers understood that the notes signed by them and by Vorlander, set forth in the four causes of action herein, were loans to the Eureka bank and in no way personal; that their notes were simply collateral to the indebtedness of the Eureka bank. Payments were made; reconcilements of checks acknowledged; evidences of indebtedness surrendered. Everything that was done by either of the parties to these transactions demonstrates their interpretation of these transactions, and without a dissenting word in the record, every person connected with the transactions, both on the part of the Eureka bank and the defendant bank, treated these transactions as loans to the Eureka bank, with the notes of its officers collateral, and for the purpose above named.

The letters are set forth above, and without entering into an analysis of the contents of the different letters, it seems clear that the letters, taken singly or collectively, involved in the first four causes of action, when interpreted in the light of the circumstances above set forth under which these loans were made, and considering too the plain terms of the letter involved in the fifth cause of action when a personal accommodation was requested and a personal obligation was to be assumed by Vorlander, conclusively demonstrate the intent, purpose, and understanding of all of the parties to these transactions that the loans were being made by the defendant bank to and for the use and benefit of the Eureka bank, and that the notes of these officers were taken as collateral to this indebtedness, and for the purpose of avoiding the necessity of the Eureka bank reporting borrowed money upon the reports to be furnished the bank examiner. It nowhere appears that any of the parties to the transactions treated these transactions as the advancing of moneys by the defendant bank to the individuals or for their use and benefit or for the use and benefit of either of them. Unquestionably the record discloses without dispute that the debt represented by the notes involved in the first four causes of action was in fact the debt of the Eureka bank, and not the debt of Vorlander personally, or of either of the officers of the Eureka bank that signed them.

In this connection, and at this time, it should be said that there is nothing in this record upon which a finding could be made that the defendant bank paid this debt with the funds of the Eureka bank with knowledge that it was the debt of Vorlander or other officers of the Eureka bank. Everywhere and at all times all of the officers of the defendant bank believed and understood that the debt was that of the Eureka bank, and if paid with the Eureka bank funds there was an entire absence of knowledge upon the part of the defendant bank or any of its officers that the funds used to pay the obligations named in these four causes of action were used in the payment of any indebtedness of Vorlander or other bank officer. There is nothing in the record to in any way put the defendant bank on notice that funds were so used. I am of the opinion that these four transactions were not personal, even though the notes were signed by Vorlander in one instance and by Vorlander and other bank officers in the other instances. They were transactions between the banks, carried on in the way the business of the Eureka bank was customarily conducted, where loans were made for its benefit, in common with other banks in that vicinity at that time. The record shows that the money involved in these four transactions was understood by all of the parties interested to be borrowed for the bank, was placed to the credit of the bank, and checked out and used exclusively by the bank for its own purposes.

[2, 3] These notes referred to in plaintiff's complaint created legal obligations of the bank, notwithstanding the fact that they were not executed in the name of the bank. In each of these causes of action the record discloses that the defendant bank sent to the Eureka bank a statement of the account of the Eureka bank as it appeared on the books of the defendant bank for the month in which loans were made, payments received, interest charged, etc., together with a blank sheet termed a reconcilement. Those statements in each month during the period of these transactions showed the credit given to the Eureka bank by the defendant bank by reason of these various notes, and also showed the charges by reason of the interest and checks received in payment thereof. In fact, the reconcilements contained the entire transactions, both debit and credit, and the Eureka bank, by its officers, duly perfected said reconcilements in writing, signed the same and returned them monthly to the defendant bank. These reconcilements constituted a

representation by the Eureka bank, made in the due course of business, either that it had collected Vorlander's note, or that he was authorized to use bank funds for its payment.

It is nowhere in this record shown that these reconcilement sheets were not the act of the bank. It is nowhere attempted to be shown that either of the officers, other than Vorlander, were actuated by dishonest motives. This was the usual and regular course of business between the banks, and the directors of the Eureka bank had notice, through the reconcilement sheets, of all of the items therein contained, and which included all that is involved in the four causes of action. The defendant bank had a right to rely on these representations. Evidently it did so to its prejudice, as otherwise it is fair to presume that it would have made some effort to collect the notes from the individuals. Notwithstanding the reconcilement was signed by Pufahl, who was cashier and vice president of the Eureka bank, and who signed a part of the notes, yet his signing and returning the reconcilements was the act of the Eureka bank, because:

(1) The accounts rendered the Eureka bank by the defendant bank were binding upon the board of directors of the Eureka bank. The directors were in duty bound to examine these accounts and the reconcilements of the Eureka bank, and the receiver who stands in his shoes cannot take advantage of the negligence of the directors. These reconcilements are notice to the directors, who cannot disregard such notice and say that their agents failed to communicate the facts to them.

(2) The reconcilements were made in the ordinary course of business, signed by the officer authorized to sign such reconcilements and were the basis of all further business relations with the defendant bank, which was wholly innocent in accepting them.

(3) Pufahl was a nominal maker of the two $5,000 notes. It is conceded in this case that he had no real interest in them. The rule of law that a principal is not bound by an admission of his agent, where the agent is known to be acting in his own interest, has no application here, where plaintiff not only failed to establish any interest of Pufahl, but it is conceded that Pufahl had no interest whatever in it, except the interests of the bank, and that he signed the note solely and only to get additional funds for the Eureka bank. His own testimony is undisputed when he stated: "When Mr. Vorlander asked me to sign the notes, he told me the purpose of the notes was to increase the bank's reserve." It is also undisputed in the record,

as testified to by Pufahl, that in no case was either of the loans named in plaintiff's first four causes of action paid to the lending bank by the officer of the Eureka bank whose name appeared upon the notes given therefor. The facts in this case, in my judgment, constitute an estoppel to the claim of the receiver. He stands in no better position than would the Eureka bank, if bringing the action itself.

[4] I am further of the opinion that the manner in which the business was done between these two banks, the forwarding of the cash letters, reconcilements exchanged between the two banks, in the manner above set forth, constituted an account stated when duly corrected and signed by the Eureka bank and returned monthly to the defendant bank. I think of no element of an account stated that was lacking. These cash letters and reconcilement sheets and statements contained a full and complete account between the parties, contained all of the items included within the transactions of all character between the banks, and included the items in question in these four causes of action, and when the parties reached an agreement by their duly authorized officers that such statements were correct, and they were signed and acknowledged and delivered with a fixed and definite amount due from either to the other, it is an account stated, binding upon both parties, and in the absence of fraud or mutual mistake, neither of which is disclosed by the record here, cannot be impeached.

[5] Something is said in the briefs that suggests that there was a conspiracy between the defendant bank and the officers of the Eureka bank to conceal liabilities of the borrowing bank, and that this constituted fraud and induced depositors and others to do business with the bank in reliance upon this alleged fraudulent misrepresentation. The first answer to that is clearly that this is not an action for fraud. The receiver stands in no better position than did the bank.

In Cherry v. City National Bank (C. C. A.) 144 F. 587, the court says: "The Guthrie bank, while a going concern, could not have maintained an action against the defendant for conversion of the money, and neither can the receiver, who takes only the rights of the bank, now do so." This case on appeal is further reported as Rankin v. City National Bank, 208 U. S. 541, 28 S. Ct. 346, 52 L. Ed. 610, where the court says: "If the Guthrie bank had sued while it was a going concern it could not have recovered, and the receiver stands no better than the bank."

In the Hanover National Bank Case, 109 F. 421, a majority of the Circuit Court of

Appeals of this circuit held that the loan was made in a certain manner to conceal liabilities from a national bank examiner was immaterial; that "the mere fact that a contract, the consideration and performance of which are lawful, incidentally assists one in evading the law is no bar to its enforcement."

It is further held in this case that the National Banking Act (Comp. St. § 9658, et seq.) provided penalties for its violation and the court would not add a further penalty by declaring the contract made with the intention to defeat the Act void. Senior Circuit Judge Sanborn further suggests that a contract upon which the action was brought was neither wrong in itself nor was there anything in its consideration or its performance prohibited by law or public policy, saying: "One who has received the benefits of the complete performance by the plaintiff of a contract, which was neither malum in se nor malum prohibitum, cannot successfully defend an action for the payment of his indebtness which has accrued therefrom on the ground that either he or another intended to do some unlawful act which was no part of the consideration nor of the performance of the agreement."

The foregoing majority opinion was followed in Re Leonard v. State Exchange Bank (C. C. A.) 236 F. 316, in which the court unanimously held that the fact that the transaction was entered into to deceive the state bank examiner as to the condition of the borrowing bank, was no defense to the recovery by the lender.

In Re Kendrick State Bank v. First National Bank (D. C.) 206 F. 940, the court held that a transaction that was made in a form to deceive the bank examiner was immaterial, and that the borrowing bank being a party to the deceit could not take advantage of its own wrong.

In Re Aldrich v. Chemical National Bank, 176 U. S. 618, 20 S. Ct. 498, 44 L. Ed. 611, it is said: "The latter bank, having enjoyed the fruits of the transaction, cannot avoid accountability to the New York bank, even if it were true as contended that the Fidelity Bank could not consistently with the law of its creation have itself borrowed the money."

[6] As appears by the facts upon which the fifth cause of action is predicated, a similar, though somewhat different, basis exists for plaintiff's claim of the right to recover. Concisely stated, the claim of the plaintiff as to this cause of action is that, it being conceded that this was the personal obligation of Vorlander, the funds with which the various payments were made were the funds of the Eure-

ka bank, and were known to be such by the defendant bank. There is no dispute as to the facts and the manner in which these payments were made and received, and they are substantially as stated in the statement of facts near the beginning of this decision. The record discloses that all of these payments were charged by the Eureka bank to Vorlander's account, and that he had sufficient credit on the books of the Eureka bank to meet the charges. Considering the payments that were made, the manner in which they were made, the cash letter to the Eureka bank by the defendant bank, the reconcilements by the officers of the Eureka bank, the absence of any knowledge by the defendant bank, or any of its officers, of dishonesty or defalcation on the part of any of the officers of the Eureka bank, in my judgment brings the defendant within a number of the defenses applicable to the first four causes of action.

These eight payments may be divided into two groups. The first, second, third, fourth, and sixth payments above set forth were made either by Vorlander's check or by draft drawn on him by the defendant bank, the checks and drafts being in each case forwarded to the Eureka bank for collection. This brings the case at bar within the specific terms of the case of Keyes v. Security Bank of Strasburg (C. C. A.) 300 F. 897. They were forwarded by the defendant bank to the Eureka bank for collection. The entire remittances of the defendant bank to the Eureka bank, including these items, were reconciled, the items accepted, and reconcilement sheets signed and returned by the Eureka bank to the defendant bank.

The defendant bank had the right to rely and did rely upon those statements in writing made by the officers of the Eureka bank, other than Vorlander, that collection of these items had been made. This statement was made both by the postcard sent by the Eureka bank to the defendant bank upon receipt of the cash letters and by statements contained in the reconcilements exchanged at the end of the month. In each of these cases the items were tentatively charged against the account of the Eureka bank, and the items forwarded by the defendant bank, as was shown in the other causes of action, was merely a conditional charge, subject to the approval of the Eureka bank, and no funds of the Eureka bank were taken by the defendant bank until it had received notice that the items on Vorlander had been collected. This brings it within the terms of the Stroudsberg Bank Case, supra, in which the Stroudsberg Bank sent to the Eureka bank Vorlander's note for

collection, and was informed that it had been collected and received Eureka bank funds in payment thereof.

[7] I am impressed by this record in addition thereto that Vorlander was authorized to use bank funds in payment of his personal obligations. If for this long period of years Vorlander did use the funds of the Eureka bank, and if it was unknown to the directors of the Eureka bank, it was solely and only because of the directors' culpable negligence in failing to supervise and examine the affairs of the bank. Knowledge of the officers and the knowledge which the directors could and would have had had they diligently performed their duties, is the knowledge of the bank, and by continued acquiescence with knowledge of such payments, authority was conclusively conferred upon Vorlander to use the bank funds. In this instance, for the reasons heretofore stated as to their other defenses, the reconcilement sheets constitute an account stated between the defendant bank and the Eureka bank, which has not been sought to be impeached.

The fifth, seventh, and eighth payments constitute the second class of payments and were made by charges against the account of the Eureka bank on the books of the defendant bank. It is undisputed that in each case, however, reconcilements were exchanged which recognized the charges as proper ones; these reconcilements were signed by an officer of the Eureka bank, other than Vorlander, and, as shown above, were the acts and representations of the bank of which the directors are bound to take notice. What I have said with reference to the first class of payments, in my judgment, applies with equal force to this class.

Further, in each of these eight transactions Vorlander's account was charged with the payment made, and in each case he had sufficient credit to more than cover the charge made. This, I am satisfied, constituted an application by Vorlander of the moneys due him from the Eureka bank in payment of his obligation, if it existed, to repay the Eureka bank the amount of its funds used by him in payment of his personal obligation. The Eureka bank, having been repaid by Vorlander, the primary debtor, the defendant bank, which stands in the position of a surety, cannot be held liable to the Eureka bank.

It follows that the issues presented are resolved in favor of the defendant and against the plaintiff. I have signed and filed defendant's proposed findings of fact and conclusions of law, and have directed that judgment be entered accordingly, with an exception to the plaintiff.