## DEITRICK et al. v. STANDARD SURETY & CASUALTY CO. OF NEW YORK.

### No. 3231.

Circuit Court of Appeals, First Circuit.

June 1, 1937.

Rehearing Denied June 29, 1937.

Robert E. Goodwin, of Boston, Mass. (Richard M. Nichols and Goodwin, Procter & Hoar, all of Boston, Mass., on the brief), for appellants.

Raymond P. Baldwin, of Boston, Mass. (Frederic H. Chase, of Boston, Mass., on the brief), for appellee.

Before BINGHAM, WILSON, and MORTON, Circuit Judges.

## WILSON, Circuit Judge.

In this appeal there were involved four suits at law brought by the receiver of the Continental National Bank of Boston, afterward consolidated with the Boston National Bank and known as the Boston-Continental National Bank, against the defendant-appellee to recover on certain surety bonds issued by an agent of the defendant purporting to secure the payment of certain promissory notes discounted at the bank, and four suits in equity brought by the surety company to cancel said surety bonds, on the ground that they were fraudulently issued by the agent of the appellee without authority or knowledge. By stipulation of the parties the actions at law and the suits in equity are all joined for the purpose of appeal.

The actions at law were originally brought by John B. Cunningham, receiver, in 1932. His respective successors as receiver were later joined as plaintiff, Deitrick being the last in order of succession, who was appointed in October, 1934. The use of the word "bank" herein refers to the Continental National Bank up to December 27, 1930, and to the Boston-Continental National Bank as to all events taking place after that date, although there is no contention that the Boston-Continental National Bank does not stand in the same relation to the surety company as the Continental National Bank.

The equity suits were referred to a master, to whom, as auditor, the law actions were also referred, and whose findings of fact were by agreement of the parties to be considered final. The facts as found by the master and auditor are substantially as follows:

In August, 1930, one Terrell M. Ragan, who was president of the Continental National Bank, and, after the consolidation, of the Boston-Continental National Bank, was indebted to one Cronin in an amount in excess of $20,000. Cronin was owing a third party $19,000 and was being pressed for payment. Cronin had given his check on the Continental National Bank to the third party in discharge of his indebtedness, although at the time he had no substantial balance at the Continental National Bank in his checking account. He sent to Ragan his note for $20,000 and informed Ragan that his check for $19,000 would be presented for payment, and, if not paid, it would mean trouble for them both.

Ragan gave Cronin's note to the discount clerk at the bank and told him to discount the note and credit the proceeds to Cronin's checking account, which was done, and on presentation of Cronin's check for $19,000, it was paid. Cronin's note was unsecured and Ragan knew it was not a sound investment for the bank.

Soon after September 1, 1930, Cronin and Ragan went to Cliff, who was attorney in fact for the surety company, and requested him to write a surety bond in the name of the surety company to secure the Cronin note to the bank. Ragan explained to Cliff that the bond would be only "window dressing" to show the bank examiners if they should ask to see the collateral for the Cronin note; that Cliff need not notify his company of the writing of such a bond, which would be valueless, as it would impose no liability on his company; and said further that Ragan as president of the bank would give Cliff a release running to the surety company relieving it of all liability on the bond, which was later done.

They drew a bond on forms furnished to Cliff by the surety company, which Cronin as principal and Cliff for the surety company signed, running to the bank, and purporting to secure the Cronin note of $20,000, which obligation was renewed from time to time by indorsement by Cliff.

In December, 1930, Ragan requested Cliff to issue another and similar bond to secure a note of the Westchester Discount Corporation for $40,000, which Ragan assured Cliff was to enable Ragan to take up on his own account some stock in the proposed consolidation of the Boston National and the Continental National Bank; that the bank examiners might not be satisfied with the Westchester loan unless further secured; and that if the merger did not go through, Cronin, Ragan, and Cliff might find themselves subject to criticism and would probably be ruined. Ragan assured Cliff that the bond would be used the same as the Cronin bond and only in case the examiners asked for collateral; that there would be no liability for the surety company and a similar release would be given as in the case of the Cronin bond. Cliff gave the bond as requested, and a release executed by Ragan for the bank was given to Cliff dated De-

cember 23, 1930. (On the ground of a misdescription of the notes which this bond purported to secure, the auditor and master ruled that the receiver could not recover on this bond.)

On June 2, 1931, one Joseph Stone owed the bank on notes approximately $52,000: Ragan informed Cliff that the examiners were at the bank and that he had informed them that these notes were covered by a surety bond, and if he, Cliff, would give the bank another surety bond for $52,000, Ragan would be able to return all three bonds in a few days. Cliff again complied with this request, though why he did so in the first instance does not appear from the record.

On July 7 and 8, 1931, another surety bond covering a loan of one Gordon A. Robinson was issued by Cliff, a release to be given as in the other cases. Cliff was given to understand that this bond was also to be used to satisfy the bank examiners in case they called for collateral and no liability would result to his company.

To each of these bonds, except the Robinson bond, was attached a copy of the power of attorney issued by the surety company authorizing the signing of all bonds by Cliff. However, a letter of instruction, which was not attached to the bonds, limited the authority of Cliff to issue bonds under such circumstances, which information was imparted to Ragan by Cliff.

All these transactions were carried out at the bank by the assistant cashier and discount clerk under Ragan's direction. The bonds were handed to the clerk by Ragan and placed in the collateral files by the clerk. Neither the clerk nor any other official or employee of the bank except Ragan had anything to do with obtaining the bonds or the indorsements approving the renewals of the notes. All the notes and bonds were discussed at directors' meetings, but were obtained by Ragan without prior consultation with any of his directors, and without prior action by the board. While they were reported to the board shortly after they were made, the circumstances under which they were issued were not disclosed to the board.

An examination of the bank's affairs in February and March, 1931, disclosed a capital impairment of $43,000, due to depreciation of investments and the comptroller insisted that $300,000 of new capital be put into the bank upon certain conditions. See J. Dudley Clark v. Boston-Continental National Bank (D.C.) 9 F.Supp. 81. Clark put this amount in the bank on June 29, 1931. after investigation of its affairs by himself and son, and upon the statement of Ragan that the loans of Cronin, the Westchester Discount Corporation, Stone, and Robinson were secured by surety bonds. The master found that Clark, in part, at least, relied upon these bonds in making his investment, though he never saw the bonds. The bank remained open until December, 1931, and after June 29, 1931, deposits were made by other depositors to the amount of $300,000, the depositors relying, as the master and auditor found, principally on the fact that the bank was open for the transaction of business, due indirectly to these bonds, though there is no evidence that the depositors other than Clark knew of the bonds being given.

The power to borrow money is one of the usual attributes of the banking business. Auten v. United States Bank of New York, 174 U.S. 125, 141, 143, 19 S.Ct. 628, 43 L.Ed. 920. So, too, the obtaining and taking of collateral for a loan must be within the legitimate scope of that business; and a president of a bank and its general manager, therefore, has authority to negotiate a loan and to take collateral therefor without being previously authorized by the board of directors. It being within the scope of his authority, any notice to him of its illegality is notice to the bank. Aldrich v. Chemical Nat. Bank, 176 U.S. 618, 627, 20 S.Ct. 498, 44 L.Ed. 611. The master and auditor so ruled.

No question is raised as to the authority of the surety company to issue similar bonds under proper circumstances, and the power of attorney of Cliff was broad enough to authorize him to write bonds of this type, though his letter of instructions limited his authority in this respect. There is no evidence that Cliff personally benefited in any way by issuing the bonds, or that any premiums were paid to him.

The master and auditor ruled as a matter of law that the bonds were not binding obligations in the hands of the bank as a going concern for the reason that the knowledge of Ragan as to their infirmities was imputed to the bank, and that they were not binding obligations in the hands of the receiver, if his rights were derived through the bank as distinguished from the creditors.

Here is the principal issue in the case. The master and auditor held that the re-

ceiver in bringing these actions did not derive his right of recovery through the bank, but because one or more creditors of the bank were deceived, and as he represents creditors he derived his right of action through them. The receiver, however, makes no such allegations in his declaration, a copy of which is typical of the declarations in each law action, with the necessary changes as to the principal and the amount, and is as follows:·

"Now comes the plaintiff in the above-entitled action and says that on December 22, 1931, he was appointed receiver of Boston-Continental National Bank by the Comptroller of the Currency of the United States; that he duly qualified and is now acting as such receiver.

"And the plaintiff says that the defendant duly entered into, executed under seal and delivered to the Boston-Continental National Bank, a national banking association duly organized by law, with an usual place of business in Boston, a written instrument or bond, copy whereof is hereto annexed marked 'A' and hereby made a part hereof; that by the terms of said bond the defendant bound itself to pay Boston-Continental National Bank the sum of * * * in the event that * * * of * * * in said District, failed within one year from the date of the bond, to wit, June 2, 1931, to make full and true payment to the Boston-Continental National Bank of an obligation in the sum of * * *; that the condition of said bond as aforesaid has been broken, in that * * * the principal named therein, has not paid the obligation described in said bond, according to its terms, except the sum of * * *, but on the contrary has failed, refused and declined to pay said obligation and still continues so to refuse, notwithstanding the fact that all times have elapsed and all conditions have been fulfilled necessary to entitle the plaintiff to payment in full of said obligation; that the defendant was duly notified of the default in accordance with the provisions of the bond; that the damages sustained by the defendant on account of the default of said * * * are in excess of. * * *

"Wherefore, the defendant is indebted to the plaintiff in the penal sum of said bond, with interest from * * * 1931.

"And the plaintiff says that this is an action at law arising under the Constitution and the laws of the United States and is a case for winding up the affairs of said Boston-Continental National Bank; and the District Court of the United States for the District of Massachusetts has original jurisdiction under section 24 of the Judicial Code of the United States [28 U.S.C.A. § 41]."

■ A receiver of a national bank under the banking laws is not the agent of the creditors. He represents them only in that what he does may be for their benefit. An agent is appointed by his principal and is responsible to him. The creditors of a national bank do not appoint the receiver. He is responsible only to the comptroller. If creditors have certain rights personal to them, the receiver cannot enforce such rights. Michelsen et al. v. Penney (D.C.) 10 F.Supp. 537, 539, 540.

■ It is clear from the pleadings that the receiver seeks to recover on these bonds as assets of the bank. In such an action, he stands no better than the bank itself. All defenses open against the bank in such a case are open against the receiver, and he is chargeable with knowledge of all facts known to the bank affecting the character of the claim. While there are decisions by state courts to the contrary, the federal decisions support this position. Scott v. Armstrong, 146 U.S. 499, 507, 13 S.Ct. 148, 36 L.Ed. 1059; Cutler v. Fry (D.C.) 240 F. 238; Yates Center National Bank v. Schaede (D.C.) 240 F. 240; Yates Center National Bank v. Lauber (D.C.) 240 F. 237; Fourth Street Bank v. Yardley, 165 U.S. 634, 653, 17 S.Ct. 439, 41 L.Ed. 855; Skud v. Tillinghast (C.C.A.) 195 F. 1, 5; Peterson v. Tillinghast (C.C.A.) 192 F. 287, 289; Keyes v. First National Bank (D.C.) 20 F. (2d) 678, 686; Burrowes v. Nimocks (C.C. A.) 35 F.(2d) 152, 159; Schumacher v. Eastern Bank & Trust Company (C.C.A.) 52 F.(2d) 925, 928, 929; Rankin, Receiver, v. City National Bank, 208 U.S. 541, 28 S. Ct. 346, 348, 52 L.Ed. 610, in which case it was held that where the president of the insolvent bank had manipulated the accounts of the bank by giving a note for which no consideration passed, the only purpose of the transaction "in fact or contemplation was a swindle upon the bank examiner." The court said that "The whole business, from beginning to end, was and was intended to be, a mere juggle with books and paper to deceive the bank examiner," and that if the insolvent bank "had sued while it was a going concern, it could not have recovered, and the receiver stands no better than the bank." The facts of this case are more fully

stated in Cherry v. City National Bank (C. C.A.) 144 F. 587, 591.

If, therefore, the contract with the surety company was illegal as to the bank, because, as the master and auditor found that the bank was charged with the knowledge of its president, a recovery could not be had by the bank. A recovery based on the contract of surety cannot be had by the receiver, since a recovery must be based on the pleadings, and the allegations of liability in the plaintiff's declarations are based solely on the contract of surety. Hookway v. First National Bank (C.C.A.) 36 F.(2d) 166, 170; McMullen v. Hoffman, 174 U.S. 639, 19 S.Ct. 839, 43 L.Ed. 1117. There is no allegation in the declarations at law that the receiver based his grounds of action on any alleged deception of, or injury to, any creditors of the bank, or that any creditors were directly or indirectly injured by the giving of the surety bonds, nor does the receiver allege that he is suing on account of any creditors so injured.

The grounds of the actions at law are that the bonds alleged to have been issued by Cliff to secure the notes of the several parties referred to in the declarations were between the surety company and the bank, and were valid, binding obligations. There is no allegation in the declarations that the receiver derived his right of action other than from the contract of suretyship entered into between the surety company and the bank. The receiver cannot rely on these bonds as a basis for recovery without being bound by Ragan's knowledge of their invalidity, which the master found was imputed to the bank. Keyes v. First National Bank, supra, 20 F.(2d) 678, at page 686; Curtis, Collins & Holbrook Co. v. United States, 262 U.S. 215, 222, 223, 43 S.Ct. 570, 572, 67 L.Ed. 956; Munroe v. Harriman et al. (C.C.A.) 85 F.(2d) 493, 495.

As to whether the receiver by proper allegations of an injury to creditors, if based on facts, could have recovered in an action brought for the benefit of such creditor or creditors, is not raised by the pleadings.

We think the auditor and master in his report went outside the issues raised by the pleadings, since the actions at law are clearly based on the contract between the surety company and the bank, in which case the receiver stands no better than the bank would have if an action had been brought in the name of the bank while it was a going concern.

The questions of whether the receiver, having brought an action against the Fidelity & Deposit Company to recover on a bond issued to indemnify the bank against the unlawful acts of Ragan in taking these bonds, the surety company can defend on the ground of an election of remedies, see Minneapolis National Bank v. Liberty National Bank (C.C.A.) 72 F.(2d) 434, 436, or for lack of notice of default in the payment of the notes, we do not decide, since there can be no recovery by the receiver on the pleadings in the case.

The judgments of the District Court in the law actions are affirmed.

The decrees in the equity suits and dismissing the counterclaims are affirmed with one bill of costs in this court to the appellee.

### On Petition for Rehearing.

PER CURIAM.

The defendants in the equity suits seek to have a rehearing on the ground that in their counterclaim in their answers to the several equity suits they asked the court to determine the amount due from the Standard Surety & Casualty Company to the Boston Continental Bank and to its receiver.

The petition should be denied. The law actions were brought on certain bonds executed by an agent of the defendants, and the equity suits were brought by the defendants to cancel the bonds.

The issue raised by the pleadings was as to the validity of these bonds as binding obligations in the hands of the receiver. No other issue was raised or tried than the validity of these bonds, except the question of an election of remedies.

The plaintiffs cite their prayer in their petition for rehearing, but a prayer must follow the allegations in the complaint or counterclaim. The plaintiffs' counterclaim distinctly raises the question of the validity of the bonds. The issue of trust for the benefit of creditors is not raised or suggested.

The plaintiffs in their brief filed in this court say: "Amendment of the pleadings have made the issues raised in the three law actions identical with the issues raised in the equity cases based on the same bonds."

The master evidently so understood the issue. In the opening paragraph of his report he states:

"These seven cases raise the question whether the Standard Surety & Casualty Company of New York (hereinafter called the Surety Company) is liable to the receiver of the Boston-Continental National Bank upon four bonds written in the name of the Surety Company by its attorney in fact, Percy G. Cliff. * * * Amendments of the pleadings have made the issues raised in the law and equity cases identical."

At the conclusion of his report he says, after a finding as to the amounts due in the law cases:

"As to the prayers of the Surety Company, all bills in equity should be dismissed. As to the prayers of the receiver, the Westchester case (Eq. No. 3851) should be dismissed, but in the other three cases a decree should be entered ordering the company to pay to the receiver the *amounts specified.*" (Italics supplied.)

The District Court so understood the issues. In his memorandum of decision he says:

"As stated by the master and auditor, these seven cases raise the question whether the Standard Surety & Casualty Company of New York is liable to the receiver of the Boston-Continental National Bank upon four bonds written in the name of the Surety Company by its attorney-in-fact, Percy G. Cliff. The bonds purported to guarantee payment respectively of a note of $20,000 made by Arthur D. Cronin, a note of $40,000 made by Westchester Discount Corporation, a note of $52,000 made by Joseph Stone and a note of $20,000 made by Gordon A. Robinson. In the four equity cases the Surety Company seeks to have the bonds cancelled; the receiver counterclaims upon the bonds. The three law cases are actions by the receiver upon the Westchester, Stone and Robinson bonds. Amendments of the pleadings have made the issues raised in the law and equity cases identical."

No issue is raised in the plaintiffs' brief except as to the validity of the bonds. The obligations of the surety company based on the depositors of the bank being injured by the giving of the bonds, and the receiver's claim against the surety company based on a trust relationship are not mentioned, and, we think, are not raised by the plaintiffs' counterclaim in the equity suits.

The petition for rehearing is denied.